UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x     Docket #: 19-cv-3316
DAVIE SIMMONS, DWIGHT REDLEY,
DERRICK AMOS, LATANYA PIERCE,
559 ST. JOHN'S PL LLC, KARL TERRY,
JOHN AND JANE DOE 1 THRU 50,

                                    Plaintiffs,            **COMPLAINT**
                                                          JURY DEMANDED


            -against-

ALEXANDER REICH, NECHADIM CORP.,
TEVES REALTY INC., HAROLD SCHWARTZ,
SEARLE SELMON, SOLOMON ROSENGARTEN,
ALAN WOHLBERG, YELADIM LLC, JOHN DOE,
 JANE DOE 1 THRU 10

                                    Defendants.
-----------------------------------------------------------x

        The Plaintiffs, by and through their attorney, Chidi Eze, complaining of the

defendants and alleges as follows:

                        **JURISDICTION AND VENUE**

1.      This is an action at law to redress the unscrupulous, illegal and deceptive business

practices in violation of NYS GBL 349, on-going, active and continuous violation of the

Racketeering Influenced and Corrupt Organizations Act ("RICO") of 18 U.S.C. §1961 &

§1962; Racial discrimination and profiling, breach of contract and unjust enrichment,

amongst other claims.

2.      This court has jurisdiction because the amount in controversy exceeds $75,000,

contains a Federal Question. Also diversity exists in this case because one of the

defendants is a resident of New Jersey, thus on that basis alone, jurisdiction is proper

based upon diversity. This within matter also arises under the Constitution of the United

States and under the Civil Rights law of 1866 pursuant to 42 USC §1981, §1983 and §1985. This Court also has pendent jurisdiction, pursuant to 28 U.S.C. § 1331, 1332, and 1367(a). This action is also brought pursuant to the RICO laws of 18 U.S.C. §1961, 1962 et seq.

3.      Venue is proper because the real estate properties involved are situated in the Eastern District of New York. Further, the incidents that gave rise to this lawsuit occurred in the Eastern District of New York. Still further, jurisdiction is specifically conferred on the United States District Court by 28 U.S.C. § 1331.

### PARTIES

4.      At all times relevant and material to all causes of action, the individual plaintiffs were and are still United State Citizens, residing in the State of New York.

5.      At all times relevant and material to all causes of action, plaintiff 559 St. John's Pl LLC was a corporation organized under the laws of New York State.

6.      At all times relevant and material to all causes of action, Nechadim Corp. was a corporation organized under the laws of New York State, and is wholly owned by Defendant Alexander Reich.

7.      At all times relevant and material to all causes of action, Alexander Reich was an individual bearing American International Passport, and New York State Identification. At all times relevant and material to this case Searle Selmon was and still is a business partner of Alexander Reich in this criminal enterprise.

8.      At all times relevant and material to all causes of action, Teves Realty Inc. was a corporation organized under the laws of the State New Jersey and wholly owned by defendant Alexander Reich.

9.      At all times relevant and material to all causes of action, Yeladim, LLC was a corporation organized under the laws of the State New York and wholly owned by defendant Alexander Reich and/or Harold Schwartz, whose business address and registered office is the same as Harold Schwartz's office address.

10.     At all times relevant and material to all causes of action, Attorneys Harold Schwartz, Solomon Rosengarten and Alan Wohlberg were and are still attorneys duly admitted to practice law in the State of New York, who maintain offices in Brooklyn, New York. These attorneys not only aid and abet the criminal enterprise, but are integral part of same.

11.     Defendants, "John Doe" and "Jane Doe" are fictitious names representing other persons and corporations whose names are unknown to plaintiffs and who participated and/or conspired in the allegations contained herein.


**FACTS COMMON TO ALL CAUSES OF ACTION**

12.     That on or about December 14, 2007, the defendants gave Patrick DePass a loan of $130,000, which same was secured by a property owned by DePass, known as and located at 963 East 85th Street in Brooklyn. Prior to giving the loan to DePass, the defendants required him to pay an under-the-table 10% of the amount of loan he was seeking. In this case, it was $13,000. This money was to be in cash, and paid in installments, as opposed to lump sum, so as to avoid detection. DePass made these payments at the offices of Harold Schwartz, attorney for defendants, located at 4920 15th Avenue in Brooklyn, before attorney Harold Schwartz ("Schwartz") and Alexander Reich ("Reich"). Upon completing the payments, defendants scheduled a closing date for the

mortgage loan. On the day of the closing, defendants deducted a further $15,000 as "broker's fee", from the loan proceeds, and then inserted as paragraph 3 of the Rider to the Mortgage, the following:

> "**The borrowers are paying their mortgage broker (ADVENT FUNDING) various fees and points origination fees for arranging this loan.**"

13.     DePass had never heard of Advent Funding prior to that day, and never saw any person from Advent Funding at the closing. Further, at the closing, DePass was made to pay all closing and title costs for both borrower and lender, including Mortgage Insurance and Mortgage Recording Tax. Having a mortgagor pay lender's Mortgage Recording Tax, under any circumstance, is strictly prohibited by NYS Tax Law §253. That law prescribes, *inter alia*, that same "…shall not be paid or payable, directly or indirectly, by the mortgagor …" NYS Tax Law 253(1-a)(a).

14.     Still further, DePass paid 'attorney fees' of $4,500 to defendant Harold Schwartz, being attorney for defendants at closings. Defendants extract a minimum of $4,500 from each borrower under the guise of 'attorney fees' for every loan closing, which is usually less than 30 minutes.

15.     After closing, DePass was left with approximately $84,500, being about 65% of the amount of the loan on paper. DePass's loan was a balloon loan for 18 months with an interest rate of 12%. DePass would have to pay the entire loan amount of $130,000 in 18 months or lose his home. This is typical of all the loans made by defendants. That DePass is a lucky man because defendants never gave a loan for more than 6 months, nor interest rate of less than 16%, to their victims.

16.     That typically, mortgagors who seek loans from defendants leave the closing table with 60-65% of the loan amount on paper. Defendants' loans are usually balloon six months loan with interest ranging from 16 % to 24%. The Defendants always set default rate at 24% or more. In most cases, defendants force the borrower to use a corporation for the home mortgage loan or add a corporation as a co-borrower, so as to circumvent the protections afforded to home loans.

17.     In 2007, Davie Simmons borrowed money from the defendants, which was secured by his home in the Hamptons, Suffolk County New York: 458 Butter Lane, Bridgehampton NY 11932. It was for a term of six (6) months, at the interest rate of 15½%. As usually, Simmons paid an unknown entity called ADVENT FUNDING a hefty broker's fee, and signed the Rider that said, at paragraph 3,[1] that Advent Funding was his own broker. Simmons never heard of Advent Funding prior to that day. Simmons paid the under-the-table cash incentive of about $100,000. Defendants insisted that Simmons add a corporation as a co-mortgagor, so as to wipe out all home loan protections, including, but not limited to the required pre-foreclosure notices.

18.      Six months later when Simmons was unable to pay off the entire loan amount, defendants threatened to foreclose, unless he signed over title to his home to them. Following this threat, Simmons signed over his title (to Reich, even though the mortgagee is Nechadim), to be held in escrow until payment is complete. In November 2015, defendants recorded the escrow title and to this day, the title to 458 Butter Lane is still vested in Reich. That same November of 2015, defendants commenced a foreclosure action. Defendants also commenced eviction against Simmons in December of 2015.

---

[1] . The same mortgage RIDER is used for all defendants' mortgages. The Advent Funding

19.     Defendants have completed eviction proceedings against Simmons, but execute

was stayed by Appellate Division for the Second Department. Defendants, via the court,

have also appointed a Receiver[2] for Simmons home, and according to the Receiver,

Simmons's monthly rent is $7,500 per month, a one-family house in Suffolk County.

20.     To this day, Simmons continues to fight to save his home, and currently has a

pending quiet title action against Nechadim, in Suffolk County Supreme, bearing Index

Number 613097/2015. That case is still active to this day. Attorney Alan Wohlberg

continues to pursue the foreclosure action, the Receivership on the house, the housing

court eviction of Simmons, while at the same time recorded the escrow deed to the house.

21.     Also, the foreclosure action defendants brought against Simmons is still active to

this day in Suffolk County Supreme Court, bearing Index Number 612508/2015.

22.     In or about June of 1996, Dwight Redley, a mechanic, gave a mortgage to a man

by the name of Albert Rosilio, for a loan of $187,000, secured by the property housing

his mechanic workshop, located at 950 Utica Avenue, Brooklyn NY. This mortgage loan

was 10% interest rate. Redley's monthly payment for that loan was set at $1,804.61

monthly, inclusive of principal and interest. The loan was for 20 years, from 1996 to

2016.  Dwight Redley is a man of little sophistication and no education. In December of

2003, that loan was purportedly assigned to defendant Alexander Reich. At that time,

Albert Rosilio advised Redley that Redley had only $40,000 left to pay off, on the

original loan of $187,000.

---

[2] . Receiver provisions are not usually found in residential owner-occupied single-family
mortgages.

23.     Upon the alleged assignment, Reich, and his co-conspirators, prepared an agreement that stated that the balance of that mortgage loan was $110,000.[3] This fraudulent agreement also changed the interest rate from 10% to 16% per annum. It did not stop there. The agreement also changed the loan from 20 years amortized loan, to one year balloon loan.

24.     Thus, Redley went from having another 13 years to pay off his little loan balance, to having just one year to pay $110,000 with a new interest rate of 16%.[4]  This false Agreement stated that Redley's new monthly payment was now $2,666 each month for a period of one year. At the signing of the agreement, Redley was made to pay hefty amount for defendants' 'attorney fees', made to pay broker's fee of about $15,000 to ADVENT FUNDING, and forced to sign a Rider to the Agreement that stated that Advent Funding was Redley's own broker. Redley was also made to pay money to the defendants under-the-table 10% in cash, as well as made to pay recording charges and all closing costs, even though there was never a closing in the real sense of it.

25.     As expected, Redley was not able to make the balloon payment after one year. Redley started defaulting on this mortgage in late 2004, while making sporadic payments, but defendants waited upon 2008 to commence a foreclosure action against Redley, because it is more 'lucrative' to delay. Prior to commencing the 2008 foreclosure action, in 2007, defendants prepared and forced Redley to sign what they called "Modification and Extension Agreement". This document is undated, except that its contents point to

---

[3] . This was after had already made payments in excess of $160,000 on the loan of $187,000 he took 7½ earlier, in 1996, wherein his monthly payment was $1,804.61.
[4] . Assignments of mortgage do not work like that. Terms are not re-negotiated and interest rates do not change. Redley knew no better.

2007. That Agreement changed Redley's interest rate from 16% to 23%.[5] The new balance became $386,661.30.

26.     Redley went from owing $40,000, to now owing $386,661.30 with interest rate of 23%. This new amount, according to the Agreement, came from adding the alleged accrued 'attorney fees' of $34,570[6], the alleged accrued interest of $149,691.40 (the interest has grown more than the principal in less than 3 years),[7] the alleged original principal of $110,000 (all the payments Redley made over the years, though sporadic, did not reduce the principal by one cent), plus a $92,400 that was allegedly loaned to Redley, which is without a date that it was given, and without a record of it anywhere. Also the so-called Modification and Extension Agreement was not recorded anywhere in ACRIS or any recording system. Redley does not remember signing any such Agreement.

27.     That 2007 Agreement set Redley's monthly payment as $4,028 for the first year; $4,344 second years; $4,541 third year; $4,739 fourth year. These are just interest only payments. The entire $386,661 was due on December 26, 2010. At this point, defendants knew that sucking the life out of Redley was more lucrative that foreclosure and auction sale of the premises. The premises were and still are a mechanic garage with no improvement.

28.     This is a common practice of defendants, designed to maximize foreclosure judgment amount, at the illegal 24% default interest rate.

---

[5] . The limit for an individual is 16% in NYS.  In fact based upon all the charges pilled upon Redley in this agreement, he was paying interest rate of over 100% per annum, as set forth hereinbelow.

[6] . Where this attorney fee came from is anybody's guess. Our best guess is for drafting the "Modification" agreement. No foreclosure had been filed by this time, 2007.

[7]. Even assuming that Redley owed16% of $110,000 for 3, 4 or even 5 years, it is still less than $100,000. 24% of $110,000 for 4 years is about $105,600.

29.     In 2008 defendants commenced a foreclosure action against Redley, when Redley was unable to keep making these payments. Redley was never given notice of the impending foreclosure and Redley never interposed an Answer, or interposed a late Answer. Redley was defaulted by defendants in the foreclosure action. The Index Number of that foreclosure action is 4633/2008 in Kings County Supreme Court.

30.     The defendants got a foreclosure judgment against Redley in the amount of $475,341.83, plus $6,500 in' attorney fees', in 2011. The Judgment of Foreclosure and Sale was signed on March 23, 2011, but instead of selling the property in an auction sale, defendants preferred to keep 'milking' Redley, as that option is much more lucrative than auctioning the property. The unimproved mechanic shack would not sell for more than $150,000 at an auction. The property is nowhere worth near the amount of judgment they obtained.

31.     On July 24, 2014, defendants entered into a stipulation with Redley in Court wherein in consideration of staying another scheduled foreclosure sale, Redley was to make the following payments to them: $6,000 on July 24, 2014; $6,000 on July 31, 2014; $11,000 on August 3, 2014. Redley was to pay a total of $23,000 in 10 days just to stave off foreclosure auction. Making these payments did not reduce the judgment amount by a cent. To this day Redley still pays the defendants $5,200 every month, and has so far paid the defendants more that $600,000, and still counting. To this day, Redley works for the defendants and barely takes any money home, and the defendants continue to hold the fraudulent foreclosure judgment over his head.

32.     Each time Redley misses a payment of $5,200, defendants would threaten him with foreclosure sale of his mechanic workshop/garage. In fact, according to court record,

the defendants, aided by their attorneys (Rosengarten and Wohlberg) have scheduled and cancelled foreclosure auction on this property 8 times since obtaining judgment of foreclosure and sale. The last one was on January 11, 2018. The other payment arrangements defendants made with Redley are not recorded anywhere to avoid detection.

33.     This criminal enterprise, conspiracy, collusion, scheming and illegal racketeering against Redley and the other victims are continuing and active to this day.

34.     In the case of plaintiff Latanya Pierce, in addition to going through the defendants' loan sharking procedures, she was forced to form a corporation to receive the home loan. Since she was desperate to get the loan in order to pay off her existing mortgage, following a fire destruction of her property for which insurance denied claim, she inevitably became a victim of defendants'. Pierce was asking for $450,000. She made a cash, under-the-table, payment of $45,000 to the defendants, in advance of the loan, which was done over a period of time. Defendants would not accept bulk payment of this $45,000. Ms. Pierce made several trip to the bank to get cash and then to the office of attorney Harold Schwartz to drop off the cash. After the last cash payment was made, defendants scheduled a closing for August 21, 2008.

35.     Ms. Pierce was subjected to the same exact treated as Mr. DePass, including the ADVENT FUNDING scam, as describe hereinabove. At the end of the closing, she only received $374,000 from the defendants, for a supposed loan of $450,000. The loan had an interest rate of 16%, and it was for six months. It was interests only loan. After 6 months, the principal of $450,000 became immediately due with a default rate of 24%.

36.     The defendants, without warning, commenced a foreclosure action against Ms.

Pierce and her corporate, being 559 St. John's Pl LLC, in Kings County Supreme, under

the Index Number 501910/2015. That foreclosure action was dismissed for several

reasons, including for usury, fraud, lack of service of predicate notices, lack of standing,

etc. On March 28, 2019, defendants re-commenced the foreclosure action against Ms.

Pierce and her corporation in an action in Kings County Supreme Court bearing Index

Number 506861/2019. This action is continuing at the time of filing of this action.

37.     With regards to Pierce, defendants waiting six years (just 2 days short) before

seeking to foreclosed upon this loan because. With a default interest rate of 24% on a

$450,000, delay is golden. Further, defendants only named her corporation, knowing

fully well the address for the corporation now houses Barclays Centre Stadium in

Brooklyn, and that serving process on the Secretary of State means that she would never

get wind of the foreclosure action. Defendants knew that corporate address no longer

existed since 2011. Defendants, who named her as borrower, refused to name her in the

complaint, let alone serve him with process. Two (2) months after commencing the case,

following her interposition of an Answer on behalf of her corporation, defendants

amended their complaint to name and serve her. The Kings County index number for that

case was 501910/2015.

38.     The Defendants Mortgage Agreements never contain a provision that allows for

the borrowers to be notified of defendants' intention to commence a foreclosure action. In

other words, the contracts are drafted to create confusion as to whether or not defendants

are required to give a pre-foreclosure notice. Certainly, all other mortgage

contracts/agreements, except for those of defendants, contain clear provision for 30 days

notice of default to the borrower prior to commencing a foreclosure action. Defendants mortgage agreements/contracts have none.  All other mortgage contracts/agreements, except for those of defendants, allow for a grace period to cure of default. Defendants' do not. Defendants contracts are intentionally drafted that way to ambush the borrowers and take their homes and sell to the highest bidder, before they get an opportunity to defendant themselves.

39.     The Defendants do not ever comply with Foreclosure laws of New York State, including but not limited to the condition precedent Notices required under New York State Real Property Actions and Proceedings Law ("RPAPL") §§1303, 1304 1306. Under RPAPL §1306, a lender is required to file a report with the Superintendent of Financial Services of New York State, within 3 days business days of mailing the notice required by RPAPL §1304 (which is the requirement to serve the borrower with a 90 day Notice of intent to commence a foreclosure action). That section also makes it mandatory to plead compliance with this law in the foreclosure complaint. Defendants never comply with this condition precedent to a foreclosure action, and defendants' foreclosure complaints never plead compliance with this law. Defendants also never complies with RPAPL§1304 in all their foreclosure filings to this day, including foreclosures filed against individuals home-owners from 2015 to current.

40.     In most of these home loans, defendants try to include a corporation as a co-borrower, so as to hike interest rates, as well as do way giving condition precedent notices, required under the law. Even when defendants are unable to cause the borrower to incorporate, or use a corporation as a co-borrower, defendants still hike interest rates above the legal limit, and also do not comply with any of these laws.

41.     New York State Banking Law §590(2) prescribes as follows:

>"No individual, person, partnership, corporation or other entity shall engage in the business of making mortgage loans without first obtaining a license from the superintendent of accordance with the licensing procedure in this article and such regulation as may be promulgated by the superintendent. The licensing provisions of this subdivision shall not apply to …(iii) any individual, person, partnership, corporation or other entity which makes not more than three such loans in a calendar year, nor more than five in a two year period, provided that no such mortgage loans have been made which were solicited, processed, placed or negotiated by a mortgage broker, mortgage banker or exempt organization."

42.     That defendants hide under different names, aliases and corporations to repeatedly violate New York State Banking Law §590(2). Even standing alone, each of the defendants has acted in violation of this law; has granted mortgage home loans in excess of the limits set forth by this law and/or its upgraded version. That the defendants are getting more sophisticated in their scheme. In other to avoid detection, defendants frequently would not record their mortgage loans. They hide behind aliases, out of state corporations, other individuals, to give these loans in the State of New York, like the loan of Karl Terry. With Karl Terry, the defendants used a New Jersey Corporation, defendant Teves Realty Inc., to lend the mortgage loan to Karl Terry.

43.     On May 18, 2010, defendants gave Karl Terry a mortgage loan of $100,000, which mortgage was later assigned to their New Jersey Corporation by the name of Teves Realty Inc., in 2014, just to obfuscate the record. Karl Terry was treated just the same way and manner that defendants treated Patrick DePass. He was basically ripped apart and came out of that closing with just over $50,000, for a loan of $100,000. In May of 2014, defendants commence a foreclosure action upon Karl Terry's home without warning and without notifying the NYS Superintendent of Banking. That foreclosure was

filed in the Eastern District of New York under the docket number 14-cv-3226, because Teves is a New Jersey Corporation. This foreclosure action is still pending in this court.

44.     Each and every mortgage loan made by defendants is usurious both facial and when the discounted monies keep by the defendants are included in the usury calculations, as they should be, as set forth hereinbelow.

45.     On October 30, 2009, Donald A. Martin wanted to borrow the sum of $300,000 from Defendants. In line with their usual practice, he was asked to advance them the sum of $30,000 in cash under-the table, which is 10% of the expected loan amount. It is only after the under-the-table payment is complete that defendants schedule a closing for the loan. Mr. Martin suffered the same fate like all defendants' victims, in that he left the closing table with less than 65% of the loan amount on paper. His home of 914 Sterling Place in Brooklyn was used secure the mortgage loan. Currently Defendants (via Reich) are maintaining an civil action in King's County Supreme Court under Index Number 15756/2014, which action is still on-going to this day against Martin and a host of others, for the entirety of the recorded mortgage amount plus interest, even though these borrowers did not receive the entire loan amount. This is because it later transpired that Martin's parent, and not Martin, was the rightful owner of the mortgaged property.

46.     Upon information and belief, in some loans, defendants request for under-the-table cash incentive of about 20% of the mortgage loan value.

47.     In November 2007, brothers, Errol Amos and Derrick Amos became another victims of the defendants' unscrupulous and illegal loan sharking enterprise. Their home of 46 West 125th Street, New York NY, became a target for defendants, as same was used to secure a loan of $200,000 from the defendants. They paid defendants under-the-table

cash payment of $20,000, which payments were received in the officers of defendant Schwartz, in the presence of Reich. They paid broker's fees to ADVENT FUNDING, having never heard of Advent Funding until that closing day. Though Amos paid off this mortgage loan, which same was accepted by defendants in full satisfaction of the loan, defendants continue to maintain the foreclosure action, to this day, while claiming that they are still owed additional sums of money in interests. This foreclosure action bears index number 850266/2015, and pending in New York County, and entitled *Reich v Pinecrest Bay properties, et al*.

48.     Upon information and belief, in the last 4 years, defendants also advanced a mortgage home loan to Derrick Amos, for his property located in Miami Florida, and without Amos receiving any foreclosure papers or any notices, defendants are now the owners of that property.

49.     In 2006 defendants loaned Pierre and Margaret Renelique the sum of $120,000 at the rate of 16% per annum for only 7 months, from April 15, 2006 to October 15, 2006, with entire principal due immediate after 7 months. The Reneliques home of 1302 Sage Street, Far Rockaway New York, was used to secure this loan. Default rate was 24%. The Reneliques went through the exact same criminal tactics employed by the defendants in granting loans, including but not limited to signing a mortgage Rider saying ADVENT FUNDING was their broker and that they are paying Advent Funding unspecified amount of Money.

50.     The Reneliques were only able to make the $1,600 monthly payments towards to mortgage loan for about 34 months for a total of $54,600.  Thus these payments would have stopped in or around February of 2009. Notwithstanding that the Reneliques made

their last payment in or around February of 2009, defendants waited until March 10, 2017 to commence a strange foreclosure action, at 24% interest, in King's County Supreme Court under the Index Number 504888/12017. That action resulted in default judgment in favor of defendants in the amount of $397,038. The foreclosure action on this loan was strange in that the defendants did not even file a complaint. They only filed summons, Notice of Motion for Summary Judgment In Lieu of Complaint and affirmation in support of summary judgment motion, all on the same day, being March 10, 2017.

51. Summary judgment was granted to the defendants without any question. It is a strange case because no predicate notices were ever pled nor filed with the motion for judgment, yet summary judgment was granted to the defendants without any question. No Foreclosure complaint was filed; no Referee was appointed to calculate the amount owed; No motion for Judgment of Foreclosure & Sale was ever done; No compliance with RPAPL 1303, 1304 nor 1306, and not even pled in any of the papers.

52. That on paper, the Reneliques borrowed the sum of $120,000, but after closing, they were left with less than $80,000. They paid 16% interest on $120,000, being $1,600 monthly, for about 7 months, then 24% interest rate kicked in. Putting this in perspective, they borrowed approximately $80,000 and paid back about $54,600 in interests, therefore they actually borrowed $25,400. This $25,400 borrowed from the defendants resulted in a judgment against them of $397,038. The defendants alone, without contribution from a 3rd party or from a Referee, or through an inquest for damages, as required by law, did this computation of amount owed.

53. On April 18, 2008 defendants gave Rocky Horsford and his corporation, Victor Horsford Realty Corp., in the sum of $130,000 secured by the borrowers two properties

located at 197 Lenox Avenue, New York, NY and 480 East 186th Street, Bronx NY. As is expected they paid a heavy broker's fee to ADVENT FUNDING, as signed that Advent Funding was their own broker. They pay the usual 10% cash money, they paid hefty attorney fees to the lender's attorney, they paid every and all closing costs for both lender and borrower, etc.

54.     In or about February of 2015, defendants commenced a foreclosure action against Rocky Horsford in New York County Supreme Court in a foreclosure action bearing Index Number 850026/2015. In May of 2015, defendants abandoned the first foreclosure action and re-commenced a second foreclosure action against Rocky Horsford and his corporation, Victor Horsford Realty, in New York County bearing Index Number 850180/2015. That action is still on-going at the time of filing this lawsuit. In May 2018, Rocky Horsford passed away aged 67 years. Thus, the action is stayed, pending the appointment of an administrator for the estate of Horsford.

55.     The list of the victims of the defendants' unscrupulous and illegal enterprise goes on and on. Some of the victims are know to us, but they would not speak to us or join in this action for fear of reprisal attacks from defendants; for fear of losing their homes and business to the defendants; or for fear of other forms of retaliation by defendants. Also, there are still a lot of these victims that we do not know, for several reasons. Other victims we know by name are Fitzgerald and Jeannette Clouden , Venda Roberts, Pamela Rogers, Abdel Satti, etc.

56.     Pamela Rogers wanted a loan of $425,000. She was asked to form a new corporation or use an existing corporation or no loan would be advanced. Pamela then used a corporation by the name of 33 Vanderbilt Inc. The loan was given in both her

name and the corporation. She was made to pay the under-the-table 10% advance fee. At closing she paid Advent Funding's "broker's fees", she paid $4,500 in 'attorney fees' to the defendants (Schwartz), plus all closing costs. The loan was secured with two of her properties; 1172 Fulton Street and 33 Vanderbilt Avenue all in Brooklyn. The recorded mortgage document said 12% annual interest rate. This was a four (4) months loan. Of Course default rate was 24%. This loan was closed on March 6, 2007.

57.     Defendants (Nechadim) commenced a foreclosure action on October 12, 2007, without notice to Pamela Rogers, in an action bearing Index Number 38177/2007 (Kings County).  The Complaint alleged that default occurred March 6, 2007, the same exact day that closing for the loan occurred.[8] The foreclosure complaint alleged 24% interest rate from March 6, 2007. Notwithstanding that Ms. Rogers did not Answer or failed to timely Answer, defendants dragged the foreclosure action until July 2015 when they obtained judgment of foreclosure in the amount of $717,203. Defendants dragged an unopposed action for 8 years, because in their game, delay is golden. This is clearly inequitable and unconscionable, if not criminal.

58.     On the same March 6, 2007, Pamela Rogers also borrowed additional $157,701.36 from defendant and they passed her through same old dirty scam. That particular mortgage and note did not state a single interest rate at all. They mortgage and Note were silent on interest and default interest rate. It did not contain any interest rate, and did not contain a default interest rate. However, the foreclosure complaint (38177/2007) alleged 24% interest from March 6, 2007, the exact same day closing

---

[8] . Usually a mortgagor has one month to make first payment, because first month payment is usually collected at the table on closing day. Nobody owes monthly payment the same day as the closing.

occurred. In July of 2015, defendants recovered judgment at 24% interest from March 6, 2007. There was also a third Mortgage and Note on the same day of March 6, 2007, for $25,000, which was also silent on interest and default rates. The defendants also alleged and recovered judgment upon that in July of 2015, at 24% interest rate from March 6, 2007.

59.     The defendants are quite sophisticated in their scheme. Sometimes they do not record these fraudulent mortgages, and sometimes they use aliases, to avoid detection. One such example is a mortgage agreement the defendants entered into in 2007. In 2007, defendants gave a mortgage home loan to plaintiff Davie Simmons, which mortgage was secured by a property located at 1641 3rd Avenue, Unit 20A, New York, New York (Block 1537; Lot 2277), recorded under CRFN 2015000215768. This mortgage was made on November 8, 2007, however, it took defendants almost Eight (8) years to record same. It was recorded on June 24, 2015, just a few days before defendants commenced a foreclosure action against that mortgagor. It took defendants 6 years to record a deed allegedly from Simmons to Nechadim, for the property 458 Butter Lane, Bridgehampton NY 11932.

60.     Plaintiffs and all of the unnamed defendants' victims are African-American persons. Plaintiffs were and are still discriminated against based upon their race and color. Defendants seek out, targeted and continue to target African-American to subject to discriminatory and disparate treatment. Defendants charged African-American annual interest rate of 14% to 24%, while charging similarly situated individuals of different races and color 10-12% annual interest rate. Defendants subjected and still subject plaintiffs to more stringent, unconscionable, inequitable, mortgage loan conditions

because of on their black race and color. Defendants committed and continue to commit the violations and crimes complained of in this Complaint, against plaintiffs, because of their race and color, in violation of the Civil Rights Acts of 1964 as codified under 42 U.S.C 1983 and 1985.

61.     Redley, as with the rest of the plaintiffs, did not know he had a cause of action against these plaintiffs until in 2018 when the within attorney heard his story and spoke with him. He knew somewhere in the law he was wronged, but did not know how, what, when or where. He Knew he has been paying a mortgage of $187,000 since 1996, and that the more he paid, the more his interest rate, principal and monthly payment rocketed. He did not know how to address it. Having paid defendants over $600,000 since 2003 to this day, and paid well over $160,000 to the originator of the loan from 1996 to 2003, prior to it being assigned to defendants, he remains confused as to what went wrong.

62.     In 2008 when plaintiff Latanya Pierce became yet another victim of the defendant, she had no idea that this was a well designed fraudulent scheme devised by the defendants to defraud the public in general. Accordingly, at that time she had no idea she had a cause of action against these defendants. Neither of the plaintiffs, at the time of actual loss, knew they had a cause of action against the defendants.

63.     In 2018, while researching to respond to defendants' motion for summary judgment in a foreclosure action brought by defendants against Pierce and her corporate entity, 559 St. John's Pl LLC, in the matter bearing Index Number 501910/2015, Pierce and the within attorney discovered these widespread deceptive practices, criminal enterprise and conspiracy of the defendants.

64.     Harold Schwartz is very instrumental to the success of the criminal enterprise. Most of the documents were and are still signed by Mr. Schwartz for and on behalf of Alexander Reich and his corporate entities. Most of the under the table payments were and are still made and received in his office and in his presence. Schwartz would usually draft all of these fraudulent mortgage agreements, etc. His office address of 4920 15th Avenue in Brooklyn, appears in most of the documents. He is the Chief perpetrator of these fraudulent schemes. In most documents, Schwartz signs as attorney-in-fact for Alexander Reich, the owner of the defendant-corporations, and for their corporate entities. Most of the mortgage assignments from Reich to his Nechadim, or vice versa, or from one of their fraudulent entities to another, are signed by Schwartz, as attorney in fact for both assignor and assignee. Most recently, he signed, as attorney-in-fact, a fraudulent assignment in a recent foreclosure action bearing Index Number 506861/2019 filed on March 28, 2019 in Kings County Supreme Court. This fraudulent mortgage assignment was filed in court by defendant Alan Wohlberg, who knew that same was forged since he handled the prior case wherein similar assignment of mortgage was rejected by the court.

65.     In the case of 501910/2015, defendants produced an assignment of mortgage, from Reich to another of their corporations, Lenox Pacific LLC, dated December 12, 2014. That foreclosure action was dismissed for several reasons, including for fraud, lack of service of RPAPL 1303, false assignment, standing, etc., in October of 2018. Upon dismissal, defendants re-filed the same foreclosure action, but produced another assignment of the same mortgage dated same day of December 12, 2014. This new assignment states that "Alexander Reich, Yeladim LLC and Favoriteyeladim, LLC", are

assigning that same mortgage to Lenox Pacific LLC. To be clear, on the December12, 2014, Reich Assigns mortgage to Lenox Pacific, and on the same day "Alexander Reich, Yeladim LLC and Favoriteyeladim, LLC." assigns the same mortgage to Lenox Pacific.[9]

66.     That in fact Reich purported in this new assignment to assign a further mortgage, originally given by Rocky Horsfall for $1,000,000, to Lenox Pacific on this day of December 12, 2014, whereas neither Reich nor any of his corporations had or owned that Mortgage in the first place on or before December 12, 2014. On that day, same was wholly owned by Bayview Loan Services. Defendants filed this fraudulent document in court on March 18, 2019. Schwartz signed for all three alleged assignors, as attorney in fact for all three. Alan Wohlberg failed same in court.

67.     The fraudulent assignment dated December 12, 2014, was produced by Alan Wohlberg in defendants' new foreclosure action with Index Number 506861/2019. Defendant Schwartz signed this fraudulent assignment for all three purported assignors, being Alexander Reich, Yeladim LLC and Favoriteyeladim, LLC.  The assignment further states that Reich assigned the mortgage of 559 St. John's Pl to FAVORITEYELADIM, LLC on December 12, 2014, which is in stark contrast to the assignment produced by defendants (defendant attorney Wohlberg) in the prior dismissed case of 501910/2015, which purported that on the same December 12, 2014, Reich assigned the same mortgage to Lenox Pacific LLC, not to Favoriteyeladim, LLC.

68.     The defendants continue to game the plaintiffs, the public, the system, the courts and the judges. This fraudulent racketeering continues to grow bolder on a daily basis, and must be stopped. Defendants have in their rank and file several attorneys, who aid,

---

[9] . Yeladim LLC and Favoriteyeladim, LLC, were never holders nor servicers of the note(s) or mortgage(s) in question  at any time.

abet, support, encourage the complained of conspiracy, collusion, racial profiling, evil and illegal racketeering enterprise, who include, but not, limited to defendant Harold Schwartz, Solomon Rosengarten and Alan Wohlberg.

69.     At other times, the defendants would designate Harold Schwartz as the lender, bearing the title "Harold Schwartz, as Nominee". Such was the mortgage loan purportedly given to B&H Development on September 23, 2014, for the premises known as 142 Central Avenue, Brooklyn; 636 Wilson Avenue, Brooklyn; 222 Brooklyn Avenue, Brooklyn; 49 W. 119th Street, New York. This mortgage loan was struck down and cancelled of record by Judge as Gerald Lebovits of New York County, as fraudulent, in an Order dated April 27, 2018 in a case bearing index number 156790/2017. This was a one-year loan of 14% interest, with purported principal of $1,100,000. This fraudulent loan also had the Advent Funding Scam and all of the hallmarks of defendants' loans.

70.     Upon information and belief, defendants never gave their victims mortgage statements, never give a statement of balance on account, and never filed any taxes or report any gains made on the mortgages, and never paid Capital Gains Tax. These defendants use several address, including, but not limited to, 4920 15th Avenue in Brooklyn, NY; 22 Kunath Avenue, Staten Island, NY; 291 Martin Avenue, Staten Island, NY 10314; 147 Cortelyou Avenue, Staten Island, NY 10312; 20A Elmwood Park Drive, Staten Island 10314; 22 Hatayasim, Ashkelon, Israel, and several others, in New York State and New Jersey.

71.     Upon information and belief, in cases where the borrower is unable to come up with the upfront 10% under-the-table 'incentive' for the loan, defendants would schedule a closing and deduct the 10% from the loan proceeds. They do this without trace by

making out the check for the 10% of the entire loan to the borrower. The check would be made payable to the borrower in CASH. Defendants would then take the borrower to their Chase Bank branch,[10] where their banker would be instructed to make the money immediately available in cash. Upon receiving the cash, the borrower will in turn hand over the cash to defendants. After this is done, the borrower would then receive his/her loan proceeds, minus the 10%, the Advent Funding Scam amount, the attorney fees scam amount, and closing costs for both lender and borrower. That way, it would appear that defendants gave the borrower that amount (the 10% amount) as part of his/her loan proceeds.

72.     That in 2012, Schwartz and Rosengarten produced a power of attorney allegedly signed by Alexander Reich, which they used to obtain money from a Federal Bankruptcy Trustee, with regards to one of defendants' mortgage liens. Rosengarten and/or Schwartz forged Reich's signature therein. In another case, same was challenged, and upon challenge defendants stipulated in court to withdraw the forged power of attorney, in a matter in Kings County Supreme Court entitled 500 Putnam v Nechadim, et al. (index number 500211/2014). A search of that case would reveal that Stipulation withdrawing the forged power of attorney and affidavit of Reich (which was also forged). However, not before defendants used that forged power of attorney to obtain $405,000 from the federal Bankruptcy Trustee in a bankruptcy matter entitled In re Creekhill Realty LLC (Case No. 11-15365 [MG]).

73.     In a foreclosure case entitled Alexander Reich vs. 423 Throop Avenue and Latanya Pierce, et al., bearing Index Number 501910/2015, Reich's identity was

---

[10]. Sometimes Defendants use Citi Bank.

challenged, causing Judge Bert Bunyan of Kings County Supreme to order that Reich

produce a signature sampler and identification. On November 19, 2015, at the offices of

Schwartz, "Reich" showed up and produced his identification and signature. It then

became clear that "Reich" was operating with at least two dates of birth. His New York

State driver's license showed his date of birth as March 1, 1942, however, his U.S.

International Passport, produced same day, had his year of birth as March 1, 1941. We

have copies of these documents. The handwriting sampler produced that day, showed

clearly that the power of attorney used to obtain money from the federal bankruptcy

trustee was forged.

74.     On August 8, 2008, Latanya Pierce closed on a loan of $290,000 from Nechadim.

Prior to that closing she was made to pay $29,000 as cash under-the-table incentive to

defendants. As usual, she paid an unknown company called ADVENT FUNDING the

sum of about $15,000, paid all closing costs for both lender and borrower and paid

attorney fees of about $4,500 to defendants. At the end she came out of the closing with

about $210,000. The loan was for six months at 16% per annum. Pierce, as required by

defendants, borrowed this loan under the corporate names, Creekhill Realty LLC and 500

Putnam LLC. This loan was secured by three of Pierce's real estate properties.

75.     In March 2012, Creekhill filed for Chapter 11 Bankruptcy: In re Creekhill Realty

LLC (Case No. 11-15365 [MG]). Two of the properties were sold (240 and 242 Madison

Street). Pierce's bankruptcy attorneys entered into negotiations with defendants, and it

was agreed that in exchange for the payment of $405,000, defendants would file

satisfaction of mortgage with regards to this mortgage loan. This agreement was reduced

to a stipulation entered into in bankruptcy court. On or about June 28, 2012, bearing a

power of attorney forged by Schwartz, which was purported signed by Reich, who was outside the country at the time, authorizing attorney Solomon Rosengarten, Esq. to act on his behalf, the defendants received a check from the bankruptcy Trustee in the amount of $405,000. On August 3, 2012 defendant filed satisfaction of mortgage for the loan. The Trustee's second Amended Disclosure Statement of August 8, 2012 made abundantly clear that the payment of $405,000 extinguished "Nechadim's" lien on the Madison Properties.

76.     When Pierce attempted to sell the Putnam property, defendants put a lien on the property claiming that they are still owed money of that $290,000 loan. This caused the amount of $184,399 to be put in escrow until defendants' remaining balance was satisfied. This notwithstanding that defendant filing satisfaction of mortgage, conning the bankruptcy Trustee with fake power of attorney to get paid $405,000; signing a stipulation in court to accept that money in full satisfaction of its mortgage lien, etc. This caused Pierce to commence an action in court against defendants and the title company, in an action entitled 500 Putnam v Nechadim et al. (index #: 500211/2014). This action is still on going as of the filing of this complaint. Thus defendants' criminal enterprise, conspiracy, collusion, scheming and illegal racketeering against Pierce and the other victims is continuing and active to this day.

77.     Every single one of defendants' loans is usurious. For example, the Pierce's loan of $290,000 given to her corporate entities carries a maximum interest rate of 24% per annum, under New York State law. For individuals, the cap is 16%. For the loan of $290,000 for six months, under NYS law, the actual interest rate of the about loan is

calculated as follows, assuming Pierce gave defendants only the under the table $29,000 cash plus Advent Funding $15,000 (44,000 total):

| | | |
|---|---|---|
| Initial Discount (money retained by lender - $44,000 x 2, to get one year) | | = $88,000 |
| Annual Interest at 16% of $290,000 | | = $46,400 |
| Total annum interest received | (88,000 + 46,400) | = $134,400 |
| Net Advance to borrower | (290,000 – 44,000) | = $246,000 |

78.     Actual interest rate is calculated by find the percentage of $134,400 on $246,000. And in example above, the actual interest rate is 54.6%. Even if you say Pierce only paid Advent Funding $15,000, without adding any other illegal payments she made, the interest rate, based on this calculation approved by NYS Court of Appeals, is still 27.6%. This method of calculation was prescribed by <u>Band Realty Co. v North Brewster, Inc</u>., 37 NY 2d 460 (Court of Appeals 1975); <u>Hammelburger v Foursome</u>, 76 AD 2d 646, 648 (2d Dept. 1980); <u>Hammelburger v Foursome Inn Corp</u>., 54 N.Y.2d 580 (Court of Appeals 1981)

79.     Reverend Copeland and her husband needed money to upgrade their home in Brooklyn. Defendant directed them to incorporation and join defendant Reich as a member of the corporation. This was done and the loan was given to this couple with all the illegal withholdings, discounts and kickbacks, etc.  Soon thereafter, the couple fell on hard times and started defaulting. Instead commencing a foreclosure action, defendant commenced a holdover action in housing court to evict this couple from their home, while claiming that the corporation belonged to defendants. The housing court was not to be fooled, and restored this couple to their home when the couple produced evidence that they paid for and incorporated the incorporation themselves.

80.    In 2016 defendants gave a home loan to Donna Mills and demanded that she form a corporation to get the loan, which she did under the corporate name of One West 125th Street LLC. This was in Westchester County NY. She was subjected to the exact same criminal loan sharking scam of the defendants, including the ADVENT FUNDING scam and attorney fees scam. In 2018, defendants commenced a foreclosure action against her in a case bearing index number 60711/2018.

81.    On January 10, 2017, defendants (via Yeladim LLC) filed a foreclosure complaint and the family home of the Deshommes (Jean, Yolette and Jeffrey), for a principal sum of $30,000. Upon information and belief, defendant gave the mortgagors only $12,400 for a purported mortgage loan of $30,000.  Defendants withheld the amount of $17,600 as payments to Advent Funding, Attorney Fees, etc. That case is still active under index number 600396/2017 (Suffolk County). The Deshommes were blind-sided by defendants, in that they had no notice of the intent to commence foreclosure action.

82.    That in most of its foreclosure complaints, defendants intentionally fail to state date of default or interest rate of the mortgage/note. This way, defendants may seek to recover 24% rate, from the very date the mortgage was made, without anyone noticing. Also, because most of defendants' mortgagors do not get notice of the foreclosure action, and/or fail to challenge same in court because they are unable to afford attorney fees. This way, the fraud is not readily obvious on the face of the complaint.

83.    In 2009, defendants conned a mortgagor to sign over his deed to them, which deed was intended to be held in escrow until the mortgage is paid off. On November 14, 2015 defendants recorded the deed in Suffolk County, which the consent of the mortgagor. The recorded deed stated that it was given to defendants in exchange for "a

continuing lien on six mortgages totaling $2,300,000" Notwithstanding that defendants'

three mortgages against said property, being 458 Butter Lane, Bridgehampton NY 11932,

amounted to $1,000,000 only. To this day, the mortgagor is still unclear where

defendants got the figure of $2,300,000.

84.     At other times, defendant Solomon Rosengarten acts as attorney-in-fact for Reich

and/or his corporate entities, and signs the mortgages on his behalf. Rosengarten also

signs some of defendants' fraudulent mortgage assignment. Rosengarten is an integral

part of this criminal enterprise and so is Alan Wohlberg. These attorneys continue to

collude with, conspire with, connive with, aid and abet the enterprise. Searle Selmon is a

partner to Reich who, at times, acts as a joint mortgagee (Joint Lender) with Reich, and at

times acts as a buffer to Reich, and at other times switches and interchanges names with

Reich, to avoid detection and to fool the public.


### AND AS FOR A FIRST CAUSE OF ACTION
### (Racketeering and Influenced Corrupt Organization ["RICO"])

85.     The plaintiffs repeat and re-allege each and every allegation above

86.     From at least 2001 and continuing through the present, defendants unlawfully,

willfully and knowingly did combine, conspire, confederate and agree to conduct and

participate, directly and indirectly, in the conduct of the affairs of the enterprise described

in the above paragraphs, respectively to defraud the plaintiffs, the public, the court and

judges, which engaged in or which activities affected interstate commerce through a

pattern of racketeering activity in violation of 18 U.S.C. § 1962 (a) (b) (c) and (d).

87.     The Defendants, their agents and employees and others known or unknown,

unlawfully, willfully and knowingly did combine, conspire, confederate and agree to

conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise described in the above paragraphs, respectively to defraud the Plaintiffs and other members of the public.

88.     Defendants are engaged in business of which its activities affects interstate commerce and through a pattern of racketeering activity in violation of 18 U.S.C. S 1962 (c).

89.     It was the object of the conspiracy that Defendants would and did defraud Plaintiffs of assets by wrongful and criminal means.

90.     The defendants each understood the scope of the conspiracy and knowingly agreed to participate in the affairs of the enterprise through a pattern of racketeering activities.

91.     That defendants individually and collectively agreed to commit at least two predicate acts of racketeering with knowledge that these acts were part of the pattern of racketeering or, in the alternative, each knew about and intended to further the scheme or the illegal acts within the scheme.  It was the object of the conspiracy that defendants would and did defraud plaintiffs, and the public, of assets through wrongful, criminal and illegally racketeering.

92.     That defendants each understood the scope of the conspiracy and knowingly agreed to participate in the affairs of the enterprise through a pattern of racketeering activities.  At all times relevant to this complaint, the enterprise was engaged in, and its activities affected interstate commerce involving interstate transportation of goods, information, services, and money (including interstate wires).

93.     In furtherance of the scheme, defendants each committed and/or aided and abetted

the commission of two or more related and continuous predicate acts of racketeering,

constituting a pattern of racketeering activity.  Upon information and belief, defendants

were associated with racketeering enterprise as its primary manager.  The predicate act of

racketeering includes but is not limited to the followings:

(a)     ***18 U.S.C § 1962(a).***  Defendants were associated with the racketeering
        enterprise as its primary facilitators, used or using or investing, directly or
        indirectly, proceeds of the operation of the racketeering enterprise which
        were received from a pattern of racketeering which defendants
        participated as principals by committing numerous violations of 18 U.S.C.
        § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1342 (use
        of fictitious name and address), 15 USC 1639 HOEPA; 12 CFR 226.32
        (Regulation Z); RESPA; TILA; and/or

(b)     ***18 U.S.C § 1962(c).***  By conducting or participating directly in the
        conduct of the racketeering enterprise through a pattern of racketeering
        activities by defendants, inter alia, on numerous occasions enticing
        plaintiffs, and others to accept discounted loans and/or have the properties
        transferred to them, filing false foreclosure actions by electronic means,
        filing false mortgage assignments, using the mail to advertise false Notices
        of Sale, using the electronic recording system, ACRIS, to record
        fraudulent mortgages, assignments, power of attorneys, contracts
        Agreements, other forms of Agreements, liens and deeds; recording by
        electronic means fraudulent assignment of mortgages, using the mail and
        wire to carried out their criminal means, communicate with victims,
        banks, and other third parties in furtherance of the criminal enterprise;
        fraudulently acquiring liens on properties through mail, internet, phone
        calls and interstate wire in violation of 49 U.S.C. § 41712, 14 C.F.R. 212
        and 14 C.F.R. 380; filing forged documents in state and federal court in
        furtherance of its criminal enterprise, including but not limited to
        complaints, affidavits, affirmations, exhibits etc.; fraudulently requesting
        plaintiffs, mortgagors, mortgagees, and others through the mail, internet,
        phone calls and interstate wire to pay several thousands of dollars to them
        by electronic wire transfer; wrongly and fraudulently representing to
        plaintiff, mortgagors, mortgagees, and others through the mail, internet,
        phone calls and interstate wire that the mortgages on the properties were
        genuine. Each mailing, use of bank electronic wire or deposit constitutes a
        separate act of racketeering in violation of 18 U.S.C. § 1341, 18 U.S.C. §
        1343, and 18 U.S.C. § 1342.  These related predicate acts occurred over a
        period of several years, were related and continuous, and constitutes a
        pattern of racketeering activity by defendants; and/or

    (c)     ***18 U.S.C § 1962(b).*** By acquiring and/or maintaining an interest in or control of the racketeering enterprise by a pattern of racketeering activity consisting numerous violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and18 U.S.C. § 1342; RPAPL 1306, 1034 1303; NYS Tax Laws, NYS Banking Law 590; etc., as set forth above; and/or

    (d)     ***18 U.S.C § 1962(d).*** By conspiring amongst themselves and/or with other co-conspirators in the fraudulent and criminal forgery and of mortgages, liens, satisfaction, etc., alleged herein above in violation of any of the provisions of 18 U.S.C. §1962, and/or aided and abetted the commission of at least two predicate offenses which were part of the pattern of racketeering, violation of the common law doctrine of aiding and abetting.

94.    As a direct and proximate result of the violation of 18 U.S.C. S 1962(c) by the Defendants described herein, Plaintiffs have been, and continue to be, injured in an amount to be determined at trial but, to be trebled pursuant to 18 U.S.C. S 1964(c), and attorney's fees.

## AS AND FOR SECOND CAUSE OF ACTION
## (DECEPTIVE BUSINESS PRATICES)

95.    The plaintiffs repeat and re-allege each and every allegation above.

96.    The actions of defendants described hereinabove are in violation the Deceptive Business Practices act as codified under GBL § **349, which** provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." GBL 349. Defendants actions and practices complained of herein are unfair, unethical, deceptive, and illegal, and are in violation of both State and Federal laws.

97.    As a direct and proximate result of defendants willful and/or negligent conducts, statements, representations, and/or omissions, plaintiffs have suffered and are entitled to compensatory damages, in an amount to be determined by the Court.

## AS AND FOR A THIRD CAUSE OF ACTION
### (MISREPRESENTATION)

98.     The plaintiffs repeat and re-allege each and every allegation above.

99.     Defendants misrepresented to plaintiffs that the loans they are offering were genuine, fair, proper, competitive, credible, harmless and without discount or withholdings. At the time defendants made the representations described hereinabove, defendants knew such representations were false, lacked sufficient facts upon which to make such representations, and/or the facts available to defendants or defendants prior dealings did not reasonably lead to the conclusion that said representation were accurate. Defendant knew or should have known, and expected that plaintiffs would rely upon the representations described herein Plaintiffs relied upon the promise of fair dealings to their detriment.

100.    Plaintiffs relied to their detriment on this promise and representations and expended the full amount borrowed, got far less than expected and suffered untold hardship.  Plaintiffs' reliance upon defendants' representations and promise are reasonable and foreseeable.

101.    As a direct and proximate result of defendants willful and/or negligent conducts, statements, representations, and/or omissions, plaintiffs have suffered and are entitled to compensatory damages, in an amount to be determined by the Court.


## AS AND FOR A FOURTH CAUSE OF ACTION
### (FRAUD)

102.    The plaintiffs repeat and re-allege each and every allegation above.

103.    The actions, conducts and inactions of defendants set forth hereinabove constitute fraud upon the defendants, in particular and the public at large. Defendants misrepresented to plaintiffs that the loans they are offering were genuine, fair, proper, competitive, credible, harmless and without discount or withholdings.  As set forth hereinabove, the mortgage contracts/agreement were also fraudulent in that they all contained that follows paragraph:

> **"The borrowers are paying their mortgage broker (ADVENT FUNDING) various fees and points origination fees for arranging this loan."**

104.    At the time defendants made the representations described hereinabove, defendants knew such representations were false, lacked sufficient facts upon which to make such representations, knew such representations were false, and the facts available to defendants or defendants prior dealings did not reasonably lead to the conclusion that said representation were accurate. Defendants knew or should have known, and expected that plaintiffs would rely upon the representations described herein. Plaintiffs relied upon the promise of fair dealings to their detriment.

105.    Plaintiffs relied to their detriment on this promise and representations and expected to receive the full amount borrowed, but got far less than expected and suffered untold hardship.  Plaintiffs' reliance upon defendants' representations and promise are reasonable and foreseeable.

106.    As a direct and proximate result of defendants willful and/or negligent conducts, statements, representations, and/or omissions, plaintiffs have suffered and are entitled to compensatory damages, in an amount to be determined by the Court, including but not

limited to rescission, avoidance of the contracts *ab initio*, plus consequential and incidental damages.


## AS AND FOR A FIFTH CAUSE OF ACTION
### (DISCRIMINATION BASED ON RACE & COLOR)

107.     The plaintiffs repeat and re-allege each and every allegation above**.**

108.     That defendants intentionally and deliberately sought out and continue to seek out African-American individuals to become victims of their unscrupulous, loan sharking criminal enterprise. Plaintiffs were and are still discriminated against based upon the race and color. Defendants targeted and continue to target African-American to subject to discriminatory and disparate treatment. That defendants actions described and complained of hereinabove constitute discrimination, and conspiracy in furtherance of this discrimination, based upon race and color in violation of plaintiff's rights secured to plaintiff pursuant to the constitution of the United States and its Amendments; secured to them by the Civil Rights Act of 1866 pursuant to 42 USC §1981, §1983 and §1985 and arising under Article 1 Section 12 of the New York State Constitution, and New York State Common Law.

109.     Based upon the foregoing, plaintiffs have been harmed by defendants and are therefore entitled to the rescission of the mortgage contracts, return to them of every money received by defendants, and issuance of satisfaction of each and every mortgage made by plaintiffs to defendants. It is further requested that defendants be permanently be enjoined from giving out loans to the public.


## AS AND FOR A SIXTH CAUSE OF ACTION

**(UNJUST ENRICHMENT)**

110.    The plaintiffs repeat and re-allege each and every allegation above.

111.    That based upon the actions, conducts and inactions of the defendants hereinabove described, constituting the unlawful enterprise, the defendants have been unjust enriched at the expensive of the plaintiffs, and as such defendants must be forced, ordered and directed to disgorge and return the illegally obtain monies to plaintiffs, including but not limited to the entire amount of each loan and issue a satisfaction for each and every mortgage made by plaintiffs in favor of defendants. It is further requested that defendants be permanently be enjoined from giving out loans to the public.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Intentional and/or Negligent Infliction of Emotional Damages)

112.    The plaintiffs repeat and re-allege each and every allegation above.

113.    As a direct and proximate result of defendants willful and/or negligent conducts, statements, representations, and/or omissions, as set forth hereinabove, plaintiffs have suffered Emotional Damages and are entitled to compensatory damages, in an amount to be determined by the Court, including but not limited to rescission, avoidance of the contracts *ab initio*, plus consequential and incidental damages.

## AS AND FOR A EIGHTH CAUSE OF ACTION
### (Joint and Several Liabilities in Joint Venture)

114.    Plaintiffs repeat and re-allege each and every allegation above.

115.    Defendants were engaged in a fraudulent and illegal scheme which caused severe

emotional and financial harm to the plaintiffs and the public and all defendants were and

are still vested in the criminal and on-going enterprise.

116.    Each member of the joint venture is not only jointly and severally liable to the

plaintiffs, but also vicariously liable for the tortuous conduct of the other member(s)

committed in the scope and course of the affairs of the joint venture.


**AND AS FOR A NINTH CAUSE OF ACTION**
**(FAILURE TO REPORT AND/OR INTERVENE)**

117.    Plaintiffs repeat and re-allege each and every allegation above.

118.    That some or all of the defendants are liable to the plaintiffs for failing to

intervene to stop this illicit enterprise that resulted in severe financial and emotional

damages to plaintiff and the public, and/or failing to report these actions to the relevant

law enforcement, who would have put an end to this criminal enterprise.


**AND AS FOR A TENTH CAUSE OF ACTION**
**(UNCONSCIONABILITY, EQUITY)**

119.    Plaintiffs repeat and re-allege each and every allegation above.

120.    The actions of defendants, as set forth hereinabove are unconscionable, unfair,

against public policy and inequitable. And as such plaintiff's are entitled to remedial and

damages recover in an amount to be determined by the Court, including but not limited to

rescission, avoidance of the contracts *ab initio*, plus consequential and incidental damages.

### AND AS FOR AN ELEVENTH CAUSE OF ACTION
### (PUNITIVE DAMAGES)

121.    Plaintiffs repeat and re-allege each and every allegation above.

122.    Because of the egregious, wanton disregard for the rights of plaintiffs, reckless, careless and public nature of the actions of defendants complained of herein, plaintiffs are entitled to the award of punitive damages against the defendants, jointly and severally, in amount to be decided by the court of the Jury.

123.    Because of the egregious, reckless and wanton disregard for the rights of plaintiffs, and public nature of the actions of defendants complained of herein plaintiffs are entitled to the award of punitive damages against the defendants, jointly and

severally, in amount to be decided by the court of the Jury. The acts and omissions of defendants complained of herein were committed fraudulently, with malice or reckless indifference to the protected rights of the plaintiffs.  In order to punish said defendants for engaging in fraudulent and unlawful business practices and to deter such actions and/or omissions in the future, plaintiffs are entitled to recovery of defendants, punitive damages.

**WHEREFORE,** Plaintiffs pray the Court for judgment as follows for each Cause of Action:

    i.     $50,000,000 in compensatory damages against all the defendants, jointly and severally;

    ii.     $30,000,000 in punitive damages against the defendants, jointly and severally;

    iii.     Permanently enjoining defendants from lending money to any member of the public, directly or indirectly, through corporation or individually, or through a third party;

    iv.     Declaring as null and void any and all mortgages loans and contracts made by  defendants, acting individually, jointly or through a corporation, including rescinding all such agreements, mortgages and notes;

    v.     Ordering defendants to disgorge any and all unlawful proceeds of this criminal enterprise;

    vi.     Dissolving any and all of defendants corporations/entities used in lending mortgage loans, and appointing court officers to administer and supervise

the affairs and operations of defendants entities to ensure compliance with

the Order of the court;

vii.    attorney's fees, plus the costs and disbursements of these actions against

all Defendants, jointly and severally;

viii.   such other relief as the Court may deem just, proper and equitable.


Dated: Brooklyn, New York
       May 3, 2019

                                        By:


                                        /s/_____
                                        CHIDI EZE
                                        Attorney for Plaintiffs
                                        255 Livingston Street, 3rd Fl
                                        Brooklyn, NY 11217
                                        (718) 643-8800