UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------x

 DAVIE SIMMONS, et al.,

                Plaintiffs,

                                                **MEMORANDUM AND ORDER**
          -against-                              19-CV-3316(EK)(ST)

 ALEXANDER REICH, et al.,

                Defendants.

-------------------------------------------x

          The Plaintiffs in this case are a group of homeowners
who obtained what they allege were predatory mortgage loans from
the Defendants.  The Plaintiffs contend that the Defendants
misled them into agreeing to unfair terms, charged usurious
interest rates, concealed the true amount of interest charged,
engaged in extortionate tactics to compel payment, and brought
wrongful foreclosure actions when Plaintiffs were unable to pay.
The Plaintiffs bring claims under the Racketeer Influenced and
Corrupt Organizations (RICO) Act and federal civil rights law,
as well as state-law claims for deceptive business practices,
misrepresentation, and fraud.  The Defendants now move to
dismiss for failure to state a claim, including on statute-of-
limitations grounds.  They also invoke several grounds on which
they argue the Court should abstain from hearing this case.

          For the reasons set forth below, the motions to
dismissed are granted.  Although I conclude that the abstention

doctrines do not apply, I dismiss the RICO and RICO conspiracy claims because they are time-barred (as currently pled) under the RICO statute.  I also dismiss Plaintiffs' federal civil rights claims for failure to state a claim.  Because I dismiss all federal claims, I decline to exercise supplemental jurisdiction over Plaintiff's state-law claims of fraud, misrepresentation, and deceptive business practices.

## I. Background

The Plaintiffs in this action are Davie Simmons, Dwight Redley, Derrick Amos, Latanya Pierce, 559 St. John's Pl. LLC (an entity owned by Pierce), and Karl Terry.  *See* Second Amended Complaint, ECF No. 55 (the "Complaint" or "Compl.").[1] Defendants are Alexander Reich, a mortgage lender; three corporate lenders Reich owned or co-owned with other Defendants, Nechadim Corp. ("Nechadim"), Yeladim LLC ("Yeladim"), and Teves Realty ("Teves"); and several lawyers who participated in Reich's lending scheme (Harold Schwartz, Alan Wohlberg, Searle

---

[1] Plaintiffs filed their first amended complaint on September 4, 2019, ECF No. 22, and the parties submitted the fully briefed motion to dismiss on February 28, 2020.  During oral argument, the Court allowed Plaintiffs an opportunity to file a proposed second amended complaint to address recent developments that Plaintiffs alleged had caused additional "new and independent injuries" within the four-year statute of limitations for RICO claims.  The Second Amended Complaint, which was filed with the Court's leave on September 10, 2020, includes three new paragraphs (¶¶ 27, 77 and 86) and one amended paragraph (¶ 46).  Defendants filed a supplemental memorandum of law in further support of their motion to dismiss to contest the new and amended allegations.  *See* Defendants' Joint Supplemental Memorandum in Support of the Motion to Dismiss, ECF No. 56.  Accordingly, the Court hereinafter refers to the Second Amended Complaint as the operative complaint.

Selmon, and Solomon Rosengarten).  *Id.*  They move to dismiss the Complaint under Federal Rule 12(b)(6) for failure to state a claim.

Defendants bring a series of motions to dismiss.  In a joint motion, Reich, Schwartz, Selmon, Nechadim, Teves, and Yeladim contend that every count in the Complaint fails to state a claim upon which relief can be granted, making dismissal appropriate under Rule 12(b)(6).  *See* Memorandum of Law in Support of Defendants' Motion to Dismiss, ECF No. 41 ("Defendants' Memorandum").  Wohlberg filed a separate motion to dismiss all claims against him pursuant to Rule 12(b)(6), joining in his co-defendants' motion and supplementing it with arguments specific to his alleged involvement.  *See* Memorandum of Law in Support of Defendant Wohlberg's Motion to Dismiss, ECF No. 44 ("Wolhberg Memorandum").  Rosengarten, appearing *pro se*, did not file a motion to dismiss, but joined in Defendants' supplemental memorandum filed on September 16, 2020.  *See* Defendants' Joint Supplemental Memorandum in Support of the Motion to Dismiss, ECF No. 56 ("Supplemental Memorandum").[2]

_____

[2] In addition to submitting the supplemental memorandum along with other moving defendants, Rosengarten filed a request for a pre-motion conference and appeared at a pre-motion conference held on October 11, 2019.  *See* ECF No. 18; Minute Entry dated 10/11/2019.  I treat this as joining the motion to dismiss.  *See, e.g., Blackwell v. Town of Greenburgh*, 13-CV-269, 2017 WL 1157168, at *1 n.2 (S.D.N.Y. Mar. 27, 2017) (deeming party joint movant because it filed a request for a pre-motion conference, appeared at the conference, and submitted a brief alongside the other movants).

The following facts, set forth in the Complaint and attached exhibits, are presumed to be true for purposes of Defendants' motions.  Plaintiffs allege that Defendants orchestrated a predatory lending scheme aimed at African American borrowers.  Each Plaintiff closed on one or more mortgage loans with Defendants.[3]  Defendants charged a higher interest rate on the loans than they led borrowers to believe, concealing the effective rate of interest by charging hidden fees that were often first disclosed only when Plaintiffs arrived at the relevant closing.  Compl. ¶¶ 13, 18, 30, 45. With these hidden fees included in the interest calculation, the loans carried an effective interest rate that far exceeded the maximum permissible under New York State usury laws, despite the loan documents still showing a compliant interest rate on their face.

The hidden fees included a broker's fee that Plaintiffs were required to pay at closing to an entity called Advent Funding, even though they had not interacted with a broker — indeed, had never heard of Advent — before.  *Id.* ¶ 18.[4]

---

[3] Defendants Reich, Schwartz, Nechadim, and Yeladim are the subjects of Plaintiffs' substantive RICO claims under 18 U.S.C. § 1962(c) and the RICO conspiracy claims under 18 U.S.C. § 1962(d).  The other defendants — Selmon, Rosengarten, Wohlberg, and Teves — are named in the RICO conspiracy claims only.

[4] Plaintiffs were required to certify that Advent Funding was their broker, even though they did not receive any brokerage services.  Defendants'

They were additionally required to pay an "under-the-table cash incentive" to Defendants, usually amounting to 10% of the loan principal. *See id.* at ¶ 13 (Simmons); *id.* ¶ 18 (Redley); *id.* ¶¶ 29-30 (Pierce); *id.* ¶ 37 (Terry); *id.* ¶ 45 (Amos). Defendants sometimes would not accept the cash payment in bulk and required borrowers to pay in installments. *See id.* ¶ 29 (Pierce made several trips to the bank to withdraw cash and dropped it off at Schwartz's office prior to closing on a loan in 2008). In the event a borrower was unable to make a 10% payment "up front," Defendants would "deduct 10% from the loan proceeds." *Id.* ¶ 71. Some borrowers also paid additional attorney's fees and recording costs at closing. *Id.* ¶ 18 (Redley was required to pay attorney fees, recording charges and closing costs, even though he met with Defendants for a mortgage assignment and not a formal closing); *id.* ¶ 74 (Pierce paid $4,500 in attorney's fees at one closing).

Many of the loans were for a term of only six months to one year. *Id.* ¶ 13 (Simmons received a six-month loan); *id.* ¶ 30 (Pierce received a six-month loan); *id.* ¶ 17 (Redley's loan was unilaterally reduced from a term of twenty years to one year upon the mortgage assignment to Reich). Plaintiffs refer to these short-term loans as "balloon" loans, designed to make it

loan agreements all included the same mortgage rider: "The borrowers are paying their mortgage broker (ADVENT FUNDING) various fees and points origination fees for arranging this loan." *See id.* ¶¶ 13, 13 n.3.

more difficult for borrowers to pay off principal and interest before the loan term concluded. *See id.* ¶¶ 17, 19, 42, 78.

After the loan agreements were signed and fees paid, Defendants failed to deliver the full amount of the loan principal specified in the applicable agreement to some borrowers. For example, the Complaint alleges that Pierce took out a $450,000 loan but received only $374,000 from Defendants, *id.* ¶ 30; and that Terry took out a loan of $100,000, but only received $50,000, i*d.* ¶ 37; *see also id.* ¶ 78 ("Typically, mortgagors who seek loans from the defendants leave the closing table with 60-65% of the loan amount on paper."). Plaintiffs nonetheless paid fees and interest based on the principal amount listed in the applicable agreement, rather than the lower amount received.

Defendants often required Plaintiffs to form, and co-sign their mortgage with, a corporation to take out the residential loans in question. The alleged purpose of this requirement was to increase the maximum allowable interest rate from the individual rate (16%) to the higher corporate rate (24%) under New York's usury law, and thus to limit the Plaintiffs' ability to assert a usury defense. *See id.* ¶ 35;[5]

---

[5] *See also* N.Y. General Obligations Law §§ 5-501(2), 5-521(1) (corporations can be charged a higher interest rate than individuals and are prohibited from interposing defense of usury).

*id.* ¶ 29 (Pierce was "forced to form a corporation to receive [a] home loan," which led to the formation of 559 St. John's Pl LLC);[6] *id.* ¶ 74 (Pierce was later required to use two corporate entities to obtain a second loan); *id.* ¶ 13 (Simmons was required to add a corporate entity as a co-mortgagor to his home loan); *id.* ¶¶ 54, 82 (identifying other borrowers that were asked to form a corporation before signing a residential mortgage agreement).

As a result of these fees and tactics, Plaintiffs allege, they paid interest rates significantly higher than the agreed-upon rate and far in excess of the maximum rate permitted under New York's usury law. *Id.* ¶ 79. By way of example, Plaintiffs describe a loan that Pierce took out in August 2008 for $290,000, for which she paid additional fees, including the broker's fee and 10% cash payment. *Id.* ¶ 74. Although the interest rate in the loan agreement was 16%, Plaintiffs allege that the "actual" interest rate on this loan was 54.6%, when accounting for all fees she paid and the reduced principal advanced to her at closing. *Id.* ¶¶ 79-80.

---

[6] It bears noting that Pierce, a plaintiff in this action, was a defendant — and recently convicted — in a criminal case alleging bank fraud in the Southern District of New York. *See United States of America v. Latanya Pierce*, No. 12-CR-0340. Her loan from Reich appears to be mentioned in the indictment in that case. *See* Superseding Indictment at ¶ 9(b)(v), ECF No. 74. It does not appear, however, that Reich was an alleged victim of the scheme charged there. In any event, it is of course theoretically possible that the same individual can defraud one lender and be defrauded by another.

After closing, Defendants did not provide Plaintiffs with mortgage statements or statements of account balance. *Id.* ¶¶ 59, 95.  Without mortgage statements, Plaintiffs had difficulty ascertaining the remaining balance on their loans, or knowing when a default occurred.  Still, the loan balance became due immediately at the end of the loan term, and if Plaintiffs were unable to pay the balance, a "default" interest rate of 24% took effect.  *Id.* ¶¶ 22, 30, 32, 47, 54, 56, 78.

Defendants waited for Plaintiffs' debts to rise significantly, even post-default, before taking aggressive action to foreclose; they did this to "maximize [the] foreclosure judgment amount."  *Id.* ¶ 22.  In initiating foreclosure actions, Defendants allegedly violated New York's foreclosure laws, which require, among other things, that a lender provide the borrower with ninety days' notice prior to commencing a foreclosure action.  *Id.* ¶ 34 (citing violations of the New York State Real Property Actions and Proceedings Law §§ 1303, 1304 and 1306).  Borrowers often received no notice before foreclosure actions were commenced, *id.* ¶¶ 31, 37, 55, 83; and, in some cases, learned of a foreclosure action only after judgment had already been entered, *id.* ¶¶ 23, 46.

Additionally, because they withheld material information like mortgage statements, Defendants could claim that Plaintiffs owed more than they really did.  *Id.* ¶ 84.  For

8

example, as to Simmons, Defendants allegedly made such claims in November 2015 when they "took title to his property; recorded [an] escrow deed without his consent, and stated same was in exchange for 'a continuing lien on six mortgages totaling $2,300,000', which he did not owe them."  *Id.* ¶ 86.  And upon filing a foreclosure action against Simmons the same month, Defendants falsely claimed that he owed a principal balance of $1 million, even though Simmons had already "offset all or most of this mortgage loan" by "handing over" another property to Defendants, which they sold for $2,000,000 before initiating the foreclosure action.  *Id.* ¶ 86.  Similarly, Defendants litigated over debts owed by Pierce and Amos, even though, Plaintiffs allege, they had not defaulted on the loans giving rise to the claimed debts.  *Id.* ¶ 46 (alleging that Amos "was making his regular payments" when Defendants foreclosed on his property without notice); *id.* ¶ 77 (alleging that Defendants continue to litigate over a debt owed by Pierce "notwithstanding paying of the mortgage loan that gave rise to the alleged debt").

To procure foreclosure judgments against Plaintiffs, the attorney defendants allegedly falsified documents and filed fraudulent documents in court.  *Id.* ¶ 65.  For example, Wohlberg is alleged to have filed a fraudulent mortgage assignment in the foreclosure proceeding against Pierce on the property at 559 St. John's Place.  *Id.* ¶ 68.  Wohlberg is said to have filed a

document dated December 12, 2014, showing the assignment of
Pierce's mortgage from Reich to an entity called Lenox Pacific
LLC (another entity Reich owned).  *Id.* ¶¶ 66; 92 n.11.  The
court dismissed the foreclosure action, finding that Reich was
not the holder or assignee at the time he commenced the action —
instead, as evidenced by the assignment that Wohlberg filed, the
entity with standing to bring the foreclosure action was Lenox
Pacific.  *See* Defendants' Memorandum, Ex. F.  So, in 2019, Reich
commenced a second foreclosure action relating to the same
property, but in front of a different judge.  There, Wohlberg is
alleged to have produced another assignment of the same
mortgage, dated the same date, but purporting to show that the
mortgage had been assigned to a different party than Lenox
Pacific.  *Id.* ¶¶ 67-68.  This assignment was executed by
Schwartz, *id.* ¶ 68, and the action remains pending in state
court, i*d.* ¶ 32.

During the pendency of the foreclosure actions and
other proceedings, defendant Reich communicated with Simmons by
phone and email, attempting to coerce him into signing over a
property deed and making threats about personal and financial
consequences if he did not comply.  *Id.* ¶ 96.  Plaintiffs refer
to several emails sent from Reich to Simmons, which include: an
email dated May 29, 2016, in which Reich threatened to report
Simmons to "Child Support" and the Internal Revenue Service if

he did not agree to sell his house to Reich, *id.*; and an email dated July 23, 2017 in which Reich threatened Simmons with consequences including an IRS action and the "wrath" of Simmons' parishioners if he did not cooperate, calling these consequences the "tip of the iceberg." *Id.*

Defendants also used the "threat" of foreclosure sale to procure payments after obtaining a judgment of foreclosure against a borrower. *Id.* ¶ 26. For example, Defendants, through their attorneys Wohlberg and Rosengarten, scheduled and canceled foreclosure auctions on Redley's property eight separate times after foreclosure judgment was entered in 2011. *Id.* This allegedly enabled Defendants to make payment arrangements with Redley that were "not recorded . . . to avoid detection." *Id.* Plaintiffs do not specify whether or how these arrangements required payments that went beyond the terms of the original loan agreements.

Most recently, the Complaint alleges, Redley was "re-injured" when he was served with a "10-day Termination Notice" dated January 7, 2020, intended to evict him from his property. *Id.* ¶ 27. This notice followed the foreclosure sale of his property, based on the 2011 judgment of foreclosure. Attached to the notice was "a forged Referee's deed granting [Defendants] title to Redley's property, which deed bore a forged Notary stamp." *Id.* ¶ 27. Plaintiffs allege the deed was "forged"

11

based on inconsistencies they claim to have identified with respect to the notary stamp and signature.[7]

Defendants are alleged to have intentionally sought out and targeted African Americans for discriminatory and disparate treatment. *Id.* ¶ 58. They allege that the Defendants charged them nominal interest rates of 14 to 24% annually (and effective rates that were much higher, in some cases), while charging similarly situated individuals of other races annual interest rates of 10-12%. *Id.* They further contend that Defendants subjected Plaintiffs to "more stringent" mortgage loan conditions based on their race. *Id.*

In addition to their federal claims under RICO and civil rights law, Plaintiffs bring state-law claims of fraud, misrepresentation, and deceptive business practices based on the same conduct.

---

[7] With respect to the notary stamp, Plaintiffs allege that a review of the New York State notary licensing system shows that the notary identification number on the deed belongs to a different individual than the notary whose name appears on the stamp, and that this individual is licensed in a different county than the one listed on the deed. *Id.* ¶ 27. With respect to the signature, Plaintiffs allege that, even though Reich's name is signed on the deed, he did not personally sign it based on a comparison of the deed against a court-ordered signature sample he previously provided. *Id.* Defendants respond that the Termination Notice and Referee deed are the result of an auction sale, which was authorized by state court. *See* Supplemental Memorandum at 2.

## II. Legal Standards

In reviewing a Rule 12(b)(6) motion, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013).  However, only "a plausible claim for relief survives a motion to dismiss." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 476 (2d Cir. 2009).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

Allegations of a scheme to defraud under RICO are subject to the heightened pleading standard of Rule 9(b).  *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 178 (2d Cir.2004).  Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  To state a RICO claim, Rule 9(b) "requires the plaintiff to delineate, with adequate particularity, the specific circumstances

constituting the overall fraudulent scheme." *Calabrese v. CSC Holdings, Inc.*, 283 F. Supp. 2d 797, 808 (E.D.N.Y. 2003).

## III. Discussion

The Court first addresses the preliminary issue of abstention. As set forth below, the Court concludes that none of the abstention doctrines raised prevent these claims from going forward here. The Court then addresses the substantive RICO, civil rights, and state-law claims, including the applicable statutes of limitations, which (as discussed below) require dismissal of Plaintiffs' claims.

A.    <u>Abstention Doctrines</u>

Defendants argue that this case should be dismissed, or at least stayed, pursuant to the prior pending action doctrine, *Colorado River* abstention doctrine, and the *Rooker-Feldman* doctrine. The Court concludes that none of these doctrines is applicable.

First, Defendants argue that this case should be dismissed because it is duplicative of the pending foreclosure actions filed in other courts.[8] With respect to prior pending

---

[8] Defendants refer to the "prior pending action doctrine" as applying to all of the pending foreclosure actions involving the parties in this case, in both state and federal court. *See* Defendants Memorandum at 24-26. The applicable analysis for the cases pending in state court is the *Colorado River* abstention doctrine. As for cases pending in federal court, a district court "may stay or dismiss a suit that is duplicative of another federal court suit," as "part of its general power to administer its docket." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000).

actions in federal court, under the Second Circuit's "first filed" rule, "a court has the power to dismiss a second duplicative suit in favor of a prior pending action absent a showing of balance of convenience or special circumstances giving priority to the second suit." *Howard v. Klynveld Peat Marwick Goerdeler,* 977 F. Supp. 654, 664 (S.D.N.Y. 1997) (dismissing a second duplicative suit in favor of a prior pending action where plaintiffs' claims in the two actions were "virtually identical" and arose out of the same employment relationship) (citing *First City Nat. Bank & Tr. Co. v. Simmons*, 878 F.2d 76, 79-80 (2d Cir. 1989)).  One of the Plaintiff's foreclosure actions is pending before another judge in this district and was filed prior to this action.  *See Teves Realty, Inc. v. Karl Terry*, No. 14-CV-3226.  But this case is not a foreclosure action; it is a RICO action by borrowers alleging that they were injured by a predatory lending enterprise.  The prior pending action doctrine is inapplicable because, in general, it applies only if "the claims, parties and available relief do not significantly differ between the two actions." *Curtis v. DiMaio*, 46 F. Supp. 2d 206, 215 (E.D.N.Y. 1999).

Similarly, Defendants argue that this Court should abstain pursuant to *Colorado River* because "parallel" state-court proceedings are ongoing.  But the *Colorado River* doctrine applies only in "extremely limited circumstances." *Eagle One*

15

*Roofing Contractors, Inc. v. Acquafredda*, No. 16-CV-3537, 2018
WL 1701939, at *4 (E.D.N.Y. Mar. 31, 2018) (quoting *Jamaica
Hosp. Med. Ctr. v. United Health Grp., Inc.*, 584 F. Supp. 2d
489, 493 (E.D.N.Y. 2008)).  First, the state and federal
proceedings must be "parallel," which means that "substantially
the same parties are contemporaneously litigating substantially
the same issue in another forum."  *Niagara Mohawk Power Corp. v.
Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d
Cir. 2012).  And second, it must be the case that the parallel
state-court litigation could result in a "comprehensive
disposition of litigation."  *Id.*

Here, while the conduct challenged in this case might
provide the borrowers with a defense to foreclosure in the
pending actions, "the question of whether a RICO violation was
committed is not before the state court" and, even if the state
court found in plaintiffs' favor, "there [would] be no liability
for RICO damages."  *Eagle One*, 2018 WL 1701939, at *5 (quoting
*DDR Constr. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp.
2d 627, 643 (S.D.N.Y. 2011)).  Because Plaintiffs' RICO claims
are not before any state court, the pending foreclosure actions
will not, and cannot, "dispose of *all* claims presented in the
federal case."  *Id.*

Defendants identify other lending cases in which
district courts abstained pursuant to *Colorado River*

16

notwithstanding the fact that the plaintiffs attempted to bring RICO claims. For example, in *Roy v. Bank of New York Mellon*, the plaintiffs challenged a foreclosure action that was pending in state court, alleging that the defendants engaged in "illegal tactics . . . for the purpose of achieving one specific goal — to foreclose on homeowners who defaulted on their loans." No. 17-CV-6729, 2018 WL 3912281, at *2 (E.D.N.Y. Aug. 14, 2018), *report and recommendation adopted*, No. 17-CV-6729, 2018 WL 4771898 (E.D.N.Y. Sept. 30, 2018). Similarly, in *Krondes v. Nationstar Mortg., LLC*, plaintiffs challenged a foreclosure action in state court by alleging that the mortgage and subsequent assignment were invalid. No. 17-CV-4974, 2018 WL 2943774, at *4 (S.D.N.Y. June 12, 2018), *aff'd*, 789 F. App'x 913 (2d Cir. 2020). Unlike these cases, Plaintiffs here do not merely challenge individual foreclosure actions in their own right; they allege numerous RICO injuries arising out of an ongoing course of unlawful conduct by Defendants that extends well beyond the acts of foreclosure alone.

Finally, Defendants seek to dismiss the claims of Plaintiffs Simmons and Redley under the *Rooker-Feldman* doctrine because there were already judgments entered against them in the state-court foreclosure proceedings. Under the *Rooker-Feldman* doctrine, "federal district courts lack jurisdiction over cases that essentially amount to appeals of state court judgments."

17

*See Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 426 (2d Cir. 2014) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283-84 (2005)). Courts consider four factors in determining whether a plaintiff is essentially seeking appellate review of a state-court judgment: "(1) the federal-court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by a state-court judgment; (3) the plaintiff must invite district court review and rejection of that judgment; and (4) the state court judgment must have been rendered before the district court proceedings commenced." *Sung Cho v. City of New York*, 910 F.3d 639, 645 (2d Cir. 2018). Defendants' argument fails at step three. *Rooker-Feldman* does not apply because Plaintiffs' RICO claims "speak not to the propriety of the state court judgments, but to the fraudulent course of conduct that defendants pursued in obtaining such judgments." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 94-95 (2d Cir. 2015).

B.    <u>RICO Allegations</u>

To plead a viable RICO claim, a complaint must allege "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001) (quoting *Pinnacle Consultants, Ltd. v. Leucedia Nat'l Corp.*, 101 F.3d 900, 904 (2d Cir. 1996)).

18

Here, Plaintiffs bring two causes of action under 18 U.S.C. § 1962(c) against Defendants Reich, Nechadim, Yeladim, and Schwartz: one for participating in an enterprise engaged in a pattern of racketeering activity through fraudulent lending practices, and one for participating in the conduct of an enterprise engaged in the collection of unlawful debt. Plaintiffs also bring two causes of action for RICO conspiracy under 18 U.S.C. § 1962(d) against all Defendants.

A "pattern of racketeering activity" under Section 1962(c), requires "at least two acts of racketeering activity" committed within a ten-year period. 18 U.S.C. § 1961(5). This statutory requirement of two "predicate" acts "does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such pattern." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989). Here, the Complaint specifies three types of predicate acts committed by Defendants in furtherance of the alleged scheme to defraud borrowers, beginning when the loan agreements were signed: mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and extortion in violation of 18 U.S.C. § 1951.

To establish a RICO violation based on collection of unlawful debt, a plaintiff must show that (1) the debt was unenforceable under state or federal usury laws; (2) the debt

19

carried at least twice the enforceable interest rate; and (3) the debt was incurred in connection with defendants' business of lending money at a usurious rate.  18 U.S.C. § 1961(6) (defining "unlawful debt"); *see also Weisel v. Pischel*, 197 F.R.D. 231, 241 (E.D.N.Y. 2000).  Under New York law, a loan to an individual with an interest rate higher than 16% per annum is unenforceable.  *See* N.Y. General Obligations Law § 5-501(2); N.Y. Banking Law § 14-a.  Here, Plaintiffs allege that all the loans at issue were usurious, and that Defendants took various steps to conceal the actual interest rates charged.

Defendants contend that these RICO claims are all barred by the applicable statute of limitations because they arise out of loan agreements that were made between 2003 and 2010.[9]  Civil RICO claims are subject to a four-year statute of limitations, which begins to run at the time that a plaintiff discovered, or should have discovered, the RICO injury.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012) (citing *Rotella v. Wood*, 528 U.S. 549, 552 (2000)); *see also Tech. Opportunity Grp., Ltd. v BCN Telecom, Inc.*, 16-CV-9576,

---

[9] "A motion to dismiss is often not the appropriate stage to raise affirmative defenses like the statute of limitations," but it may be raised "as long as the affirmative defense is based on the facts alleged in the complaint." *Ortiz v. City of New York*, 755 F. Supp. 2d 399, 401 (E.D.N.Y. 2010).  Accordingly, dismissal for untimeliness pursuant to Rule 12(b)(6) is warranted where the "complaint shows *clearly* that a claim is not timely." *Id.*

2019 WL 4688628, at *6 (S.D.N.Y. Sept. 25, 2019) ("It is the
RICO injury that triggers the accrual, not the RICO violation.")
(quoting *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 158 (S.D.N.Y.
2014)).  "An injury is 'discoverable' when a plaintiff has
constructive notice of facts sufficient to create a duty to
investigate further into the matter." *World Wrestling Entm't,
Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 525 (S.D.N.Y.
2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009) (quoting
*Congregacion de La Mision Provincia de Venezuela v. Curi,* 978 F.
Supp. 435, 444 (E.D.N.Y. 1997)).  In other words, the statute of
limitations begins to run when a plaintiff has actual or inquiry
notice of the alleged injury.  *Koch*, 699 F.3d at 150-51.

        The question of inquiry notice "is an objective one,"
and "dismissal is appropriate when the facts from which
knowledge may be imputed are clear from the pleadings." *Jakks*,
530 F. Supp. 2d at 525 (quoting *Salinger v. Projectavision,
Inc.,* 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996)).  "[K]nowledge of
the fraud will be imputed to a plaintiff if there are
circumstances sufficient to alert a reasonable person to the
probability that he or she has been defrauded." *Id.* (citing
*Curi,* 978 F. Supp. at 444).

        Here, Plaintiffs allege that Defendants made
fraudulent misrepresentations in connection with their loan
agreements, causing them to take out loans with illegally high

21

interest rates.  Assuming their allegations are true, Plaintiffs sustained an injury when they assumed these loan obligations. *See Chainani v. Dime Sav. Bank FSB*, No. 94-CV-7549, 1996 WL 622031, at *4 (S.D.N.Y. Oct. 28, 1996) (plaintiff that was fraudulently induced into signing a loan agreement suffered RICO injury at the time she assumed the loan obligation).  Plaintiffs are presumed to have been aware of the terms of their loan agreements — all executed outside the RICO statute of limitations — at the time of closing, even if they did not appreciate their illegality at that time.  *See Done v. Option One Mortg.*, No. 09-CV-4770, 2011 WL 1260820, at *8 n.5 (E.D.N.Y. Mar. 30, 2011) (where the RICO injury asserted by plaintiff related to the terms of a loan document, the plaintiff was "clearly aware" of the terms at the time he signed it); *see also Med. Herald Publ'g Co. v. J.P. Morgan Chase Bank, N.A.*, No. 13-CV-6979, 2014 WL 6769755, at *3 (S.D.N.Y. Nov. 25, 2014) ("That Plaintiff signed these [loan] documents indicates that it read and agreed to their terms.").  Plaintiffs were also aware, of course, of the additional fees they were required to pay at closing.  Accordingly, any "injuries" that flowed from the loan documents or the additional fees at closing are time-barred. *See Done*, 2011 WL 1260820, at *8 n.5  (concluding that the RICO limitations period began at the time plaintiff signed the relevant loan document).

Plaintiffs argue, however, that they incurred certain "new and independent" injuries within the statute of limitations period, Plaintiffs' Opposition at 12, and that, in any event, the "fraudulent concealment doctrine" applies because Defendants took steps to obscure the ways in which the loans violated state usury laws — the critical component of Plaintiffs' alleged injury. *Id.* at 13.  The Court addresses these arguments in turn.

     i.  <u>New and Independent RICO Injuries</u>

With respect to Plaintiffs' first argument, the Second Circuit has adopted a "separate accrual rule," under which a "new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998) (citing *Bankers Tr. Co. v. Rhoades,* 859 F.2d 1096, 1103 (2d Cir. 1988)).  Where subsequent injuries "derive from" an earlier event, they cannot be said to be "new and independent" of the core injury. *See Long Island Lighting Co. v. Imo Indus., Inc.,* 6 F.3d 876 (2d Cir. 1993) (finding that RICO injury had occurred at the time plaintiffs knew or should have known of a design defect in the generators they had purchased, and that the later failure of the generators and consequent financial losses did not give rise to a new and independent RICO claim).  On the other hand, where

subsequent injuries derive from separate unlawful acts, such as multiple misappropriations of funds, they give rise to new and independent injuries and begin a new four-year limitations period. *See Bingham v. Zolt,* 66 F.3d 553 (2d Cir. 1995) (finding new and independent injuries in subsequent diversions of money from estate, even though the original fraudulent transfer of assets and contract rights that enabled those diversions occurred outside the statute of limitations).

As alleged, Defendants' scheme was about making and enforcing mortgage loan agreements that were unlawful by their terms, with the ultimate objective of obtaining outsized interest payments and, when a borrower defaulted, an interest in their property.  In furtherance of the scheme, Defendants brought foreclosure and eviction proceedings against Plaintiffs who were ostensibly in default.  Plaintiffs contend that proceedings initiated within the four-year limitations period gave rise to new injuries, citing a foreclosure action against Simmons filed in November 2015, Compl. ¶¶ 14, 86; an eviction proceeding against Simmons filed in December 2015, *id.* ¶ 14; a foreclosure action against Pierce filed in March 2019, *id.* ¶ 31; and a termination notice served on Redley in January 2020, following the foreclosure sale of his property, *id.* ¶ 27. However, a foreclosure or eviction proceeding based on a defaulted mortgage, without more, derives from the underlying

24

loan agreement, and cannot be the basis for a new and independent injury. *See, e.g.*, *Rosenshein v. Meshel*, 688 F. App'x 60, 63 (2d Cir. 2017) (foreclosures on collateral underlying plaintiff's investment were "merely symptoms" of underlying RICO injury, which occurred at the time that plaintiff made allegedly fraudulent investment); *Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 27 (2d Cir. 2015) (foreclosure of hotel and its subsequent sale at auction were "direct consequences" of the original RICO injury, which occurred when plaintiff started paying higher labor costs to hotel workforce); *Goel v. Am. Digital Univ., Inc.*, No. 14-CV-1895, 2017 WL 1082458, at *10 n.13 (S.D.N.Y. Mar. 21, 2017) (foreclosure was not a new and independent injury because defendant "merely sought to enforce its security interest" in the shares that were pledged to them earlier).

The Second Circuit addressed analogous factual allegations in *Merrill Lynch*, 154 F.3d 56. In that case, investors claimed that defendants made fraudulent representations and omissions to induce them to invest in real estate limited partnerships, even though defendants knew that the investments could not produce the gains promised. *Id.* at 57, 59. The capital investments were made outside of RICO's statute of limitations, but the investors argued that they suffered new and independent RICO injuries within the

25

limitations period when defendants disseminated performance reports containing additional misrepresentations and collected annual fees in furtherance of the scheme.  The Second Circuit, reviewing the statute-of-limitations issue *de novo*, disagreed, concluding that the scheme was "fraudulent at the outset"; the defendants' later actions to conceal the fraud and collect more money represented "continuing efforts" to carry out the scheme, as opposed to "separate and distinct fraudulent acts resulting in new and independent injuries." *Id.* at 59-69.  Similarly, here, Defendants' loan agreements were allegedly "fraudulent at the outset," and the actions Defendants later took to collect on Plaintiffs' defaulted loans were therefore "continuing efforts" to carry out the underlying scheme.

The Complaint also alleges that Plaintiffs Redley and Pierce were injured as a result of Defendants' use of fraudulent documents in court within the past four years, but it does not plausibly allege that they sustained new and independent injuries as a result of this conduct.  First, the Complaint alleges that Redley was "re-injured" when he was served with a "10-day Termination Notice to Vacate Possession, dated January 7, 2020," which attached "a forged Referee's deed granting [Defendants] title to Redley's property, which deed bore a forged Notary stamp."  Compl. ¶ 27.  However, the Termination Notice followed a foreclosure sale that was authorized by a

state-court judgment and therefore is derivative of the original loan agreement underlying the foreclosure.  The Complaint does not plausibly allege how, specifically, the allegedly forged deed caused an independent injury, or why the forgery would have been necessary at all after the Defendants had successfully obtained a foreclosure judgment from a court.

And the allegations concerning the fraudulent mortgage assignment filed in the 2019 foreclosure action against Pierce suffer from the same defects.  The Complaint alleges that Defendants "re-commenced" the foreclosure action against Pierce in 2019, *id.* ¶ 31, using a different mortgage assignment than was previously filed, *id.* ¶ 66.[10]  But the foreclosure action was derivative of the underlying loan, regardless of which assignee litigated the case, and, again, the Complaint does not plausibly allege how the allegedly fraudulent mortgage assignment caused an independent injury.  Accordingly, under *Merrill Lynch*, these alleged injuries are among the "continuing efforts" by Defendants to recover on the debts incurred in connection with the original loan agreements.

Plaintiffs identify other acts by Defendants that they contend gave rise to new and independent injuries within the

---

[10] Defendants allegedly produced two different mortgage assignments as part of the first and second foreclosure actions against Pierce, both dated December 12, 2014.  *Id.* ¶ 66.

limitations period.  The Complaint says that some Plaintiffs —
Simmons, Pierce, and Amos — sustained new and independent
injuries because the foreclosure actions against them were based
on new and false claims that they owed more than they really
did.  *See* Compl. 46 ¶ (Amos); ¶ 77 (Pierce); ¶ 86 (Simmons).  If
these Plaintiffs plausibly alleged that Defendants took
unilateral action, shrouded in secrecy, to increase their
outstanding loan obligations, that conduct might give rise to
new and independent injuries.  *Cf. Cent. Cadillac, Inc. v. Bank
Leumi Tr. Co. of N.Y.*, 808 F. Supp. 213, 225 (S.D.N.Y. 1992),
*aff'd*, 99 F.3d 401 (2d Cir. 1995) (finding plaintiffs plausibly
alleged that defendants "violated RICO by repeatedly and
arbitrarily altering the terms of payment and the amount owed,"
resulting in separate injuries).

But Plaintiffs make these allegations only in
conclusory fashion.  Pierce allegedly incurred a new and
independent injury in September 2019 when Defendants sought to
recover an unpaid balance from her, despite her claim that she
had paid off the loan at issue.  *Id.* ¶ 77.  Amos alleges a new
and independent injury in early 2019, when he learned that
Defendants had obtained title to his property even though "he
was making his regular [mortgage] payments."  *Id.* ¶ 46.  These
allegations offer no factual support for the contention that
Defendants unilaterally altered the outstanding balances.  *See*

28

*Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

Simmons comes closer to plausibly alleging a new and independent injury on this basis, but his allegations, too, fall short.  First, the Complaint alleges that Simmons "sign[ed] over his deed" to Defendants in 2009, "to be held in escrow until the mortgage [was] paid off."  Compl. ¶ 85.  Defendants did not record this deed until November 14, 2015.  *Id.*  In doing so, Simmons claims that Defendants "took title to his property; recorded [an] escrow deed without his consent, and stated same was in exchange for 'a continuing lien on six mortgages totaling $2,300,000,' which [Simmons] did not owe them."  *Id.* ¶ 86. Although Simmons claims that he was "re-injured" by these actions, his factual allegations are inadequate to establish a new and independent injury.  In particular, he does not explain how he was newly injured when Defendants "recorded the escrow deed" to his property in 2015, after he had already "signed over" the deed to be held in escrow in 2009 (before the limitations period).  And, even though Simmons disputes that he owed Defendants $2,300,000, he does not allege that Defendants actually sought to recover this amount from him.  (As described below, he alleges that they sought to recover $1 million.)

29

Second, Simmons claims he was "further re-injured when, in the same November of 2015, defendants filed a foreclosure action against . . . the same property" and claimed "that he owed the principal balance of $1,000,000." *Id.* ¶ 86. Simmons asserts that this claim was "clearly false" because he "had offset all or most of this mortgage loan, in exchange for his 5th Avenue house, located at 2001 5th Avenue, NY NY, which he handed over to defendants, which property was later sold by defendants for over $2,000,000, prior to the November 2015 foreclosure complaint." *Id.* The statement that he "handed over" property to offset "all or most" of his mortgage loan is simply too nebulous to constitute a plausible allegation that Simmons was in compliance with the written terms of his mortgage when the Defendants declared him in default. If the property transfer satisfied "most," but not all, of his current obligations, he would presumably remain in default. That he had "offset" his mortgage balance does not sufficiently support an inference that the Defendants brought a fraudulent foreclosure action. Therefore, Simmons does not adequately allege a "separate and distinct fraud." *Merrill Lynch*, 154 F.3d at 60. At most, as currently pleaded, he describes an ongoing dispute over the unpaid balance on one or more mortgages. The Complaint also does not identify what injuries to business or property, if any, Simmons incurred as a result.

Finally, the Complaint also alleges that in 2016 and 2017, Defendants used threats to pressure Simmons into giving or selling his property to Reich. *Id.* ¶ 96. Plaintiffs identify emails from Reich to Simmons, during the pendency of a foreclosure action, threatening Simmons with harmful personal or financial consequences if he refused to cooperate (including reporting him to "Child Support" or the IRS). *Id.* As alleged, however, these threats relate back to the underlying loan agreement and foreclosure action against Simmons; the separate accrual rule does not apply where the complaint "alleges new RICO violations that merely reinforce the *same* injury." *BCN Telecom, Inc.*, 2019 WL 4688628, at *7-*8 (payments made in response to extortionist threats within the RICO limitations period did not represent new and independent injuries, where the threats "reminded" plaintiff of the obligations imposed by the underlying scheme). Moreover, the Complaint only alleges that such threats were made; it is silent as to whether Simmons was injured in his business or property as a result.[11] Therefore, there is no basis on which to conclude Simmons incurred new and independent injuries as a result of this conduct.

---

[11] For example, the Complaint does not allege that Simmons actually transferred title to his property or made additional payments to Reich out of fear that Reich would follow through on these threats.

Accordingly, the Complaint fails plausibly to allege new and independent RICO injuries within the applicable statute of limitations.

ii.   Fraudulent Concealment Doctrine

Plaintiffs also argue that the statute of limitations for their RICO claims should be deemed to have been tolled under the fraudulent concealment doctrine because the Defendants concealed the true interest rate and other key terms of the loans, and because the Defendants failed to provide account statements that might have assisted the Plaintiffs in understanding the nature of the fraudulent conduct here.

Under federal common law, the statute of limitations under RICO may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing, (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period, and (3) the plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled.   *Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 36-37 (2d Cir. 2002), *overruled on other grounds by Slayton v. Am. Exp. Co.*, 460 F.3d 215 (2d Cir. 2006).   Allegations of fraudulent concealment, like other allegations of fraud, must be pleaded with particularity in accordance with Rule 9(b).   *See*

32

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566 (2d Cir. 2005) (*per curiam*).

With respect to the first element above — wrongful concealment — a plaintiff must show either that the defendant took "affirmative steps to prevent the discovery of the plaintiff's injury," or that the nature of the wrong was "self-concealing." *Butala v. Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996).  The second and third elements are related; recognizing that the plaintiff did not have complete information as a result of the defendants' wrongful concealment, the court must determine "whether the information plaintiff *did* receive sufficed to trigger a duty to inquire." *Lenz v. Associated Inns & Restaurants Co. of Am.*, 833 F. Supp. 362, 373 (S.D.N.Y. 1993). If there was a duty to inquire, plaintiffs "may not rely on allegations of fraudulent concealment to avoid the limitations bar unless they exercised due diligence in attempting to ascertain the facts related to the alleged fraud, but were nevertheless unable or prevented from discovering the nature of their claim." *Butala*, 916 F. Supp. at 320 (quoting *Griffin v. McNiff*, 744 F. Supp. 1237, 1256 (S.D.N.Y. 1990), *aff'd*, 996 F.2d 303 (2d Cir. 1993)); *see also Koch*, 699 F.3d at 157 ("Reasonable diligence is a prerequisite to the applicability of equitable tolling.") (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997)).

In support of the doctrine's application, Plaintiffs allege that Defendants charged various fees at mortgage closings to obscure the actual interest rates they charged, and that in some instances, loan agreements omitted information about the interest rate borrowers would be charged upon default. Plaintiffs also allege that Defendants never provided Plaintiffs with mortgage statements or statements of balance of account, and that Defendants withheld this information so that Plaintiffs never knew or could have known that the amount of the principal owed was illegally increasing, that the interest rates charged were usurious, or that other legal violations occurred during the foreclosure process.

Although Plaintiffs allege that Defendants concealed material information, they are nevertheless presumed to have known the terms of the loans they signed. *See Done*, 2011 WL 1260820, at *8 n.5. And they knew the amount of the fees they paid at the closings. Similarly, they knew the amounts of the monthly payments they made. However, Plaintiffs make no allegations with respect to their diligence in pursuing additional information about the status of the loans in question. No Plaintiff alleges that they requested mortgage statements or balance information from Defendants, or took any steps to investigate the interest rates they were being charged or precise balances they owed. *See Lenz*, 833 F. Supp. at 373

(finding plaintiffs did not exercise diligence with respect to
the financial status of their investments, even where defendants
conceded that they failed to timely provide plaintiffs with
"significant documentation," including annual financial
reports).  To toll the statute of limitations, plaintiffs "must
demonstrate that the defendants prevented them from
investigating the fraud *in spite of* the plaintiffs' exercise of
due diligence," *Butala*, 916 F. Supp. at 320; the current
pleadings do not support such a finding.

   C.     Civil Rights Claims

        Plaintiffs allege that the conduct described above
also gives rise to liability for civil rights violations
pursuant to 42 U.S.C. §§ 1981, 1983, and 1985, as well as the
United States Constitution, the New York State Constitution, and
the New York State Common Law.  Compl. ¶ 128.  Defendants argue
that Plaintiffs' civil rights claims are time barred because the
statute of limitations for claims of race-based discrimination
run from the time the "plaintiff knows or has reason to know of
the injury giving rise to the harm."  Defendant's Memorandum at
19 (quoting *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir.
2015)).  They argue that the relevant statutes of limitations
for claims under 42 U.S.C. §§ 1981, 1983, and 1985 is three or
four years, which would run from the time the loan agreements
were made.  *Id.* at 21.  As set forth below, the Complaint does

not state a plausible claim for unlawful discrimination, and therefore the Court need not reach the question of the statute of limitations.

To state a claim under 42 U.S.C. § 1981, "a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute," including the making and enforcement of contracts. *Fouche v. St. Charles Hosp.*, 64 F. Supp. 3d 452, 456 (E.D.N.Y. 2014). Essential to an action under § 1981 are allegations that defendants' acts were purposefully discriminatory and racially motivated. *Id.* at 457. "Naked assertions of race discrimination, without any supporting facts, are insufficient to state a § 1981 claim." *Id.*

The Complaint falls short of plausibly alleging that Defendants' acts were purposefully discriminatory and racially motivated. Plaintiffs allege that Defendants intentionally targeted African Americans for discriminatory and disparate treatment based on their allegation that they, and additional "unnamed victims," are African American. Compl. ¶ 58. Plaintiffs also allege in general terms that Defendants gave them less favorable loan terms than individuals of other races, but they do not offer factual allegations sufficient to support

36

an inference of discriminatory intent. *See Jackson v. Wells Fargo Home Mortg.*, 811 F. App'x 27, 29-30 (2d Cir. 2020) (plaintiff made only "conclusory and speculative assertion that she was targeted on the basis of her race," where the sole allegations of racial discrimination were "that plaintiff is African American, she qualified for a mortgage refinancing, her applications were denied, and all the decisionmakers at Wells Fargo were white"); *Rodriguez v. Bear Stearns Cos., Inc.*, No. 07-CV-1816, 2009 WL 995865, at *9 (D. Conn. Apr. 14, 2009) (dismissing Section 1981 claim against mortgage servicers whose predatory lending activities had a disparate impact on minorities, because "differential treatment alone [was] insufficient to show intentional racial discrimination") (citing *James v. Valtierra*, 402 U.S. 137 (1971)). As pleaded, Plaintiffs' allegations are too conclusory to state a claim for relief. *Cf. Barkley v. Olympia Mortg. Co.*, No. 04-CV-875, 2007 WL 2437810, at *11 (E.D.N.Y. Aug. 22, 2007) (finding plaintiffs stated a Section 1981 claim where allegation of racially discriminatory intent was supported by numerous, specific factual allegations "describ[ing] how defendants conspired to target minorities as well as how they executed the fraudulent scheme").

Plaintiffs' conspiracy claim under 42 U.S.C. § 1985 fails for the same reason — namely, because Plaintiffs do not

provide any factual basis to support a finding that Defendants entered into an agreement to discriminate based on race.

Finally, to establish a claim under 42 U.S.C. § 1983, a plaintiff must show "the violation of a right secured by the Constitution and laws of the United States," and that "the alleged deprivation was committed by a person acting under color of state law." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87–88 (2d Cir. 2015) (citations and internal quotation marks omitted).  Plaintiffs' claim under Section 1983 fails because none of the Defendants is alleged to have engaged in the conduct at issue in the Complaint as a state official or otherwise acting under color of state law.

D.    <u>State-Law Claims</u>

Plaintiffs also bring state-law claims of common-law fraud and misrepresentation, and deceptive business practices in violation of New York General Business Law Section 349. However, because the parties are not diverse (all are New York residents, except Teves), jurisdiction in this case is based on causes of action arising under federal law.  Plaintiffs' RICO claims and civil rights claims are the only claims that arise under federal law, and as set forth above, all such claims are subject to dismissal.

A district court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed

38

all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3); *see also Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").  Having dismissed all of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims. *See Merrill Lynch*, 154 F.3d at 61 (affirming district court's declination of supplemental jurisdiction where RICO claims were dismissed as time-barred).

E.   Defendants' Request for Sanctions

Finally, Defendants argue that the Court should impose sanctions pursuant to Fed. R. Civ. P. 11 on the ground that Plaintiffs' RICO claims are frivolous.  Defendants' Memorandum at 49-50 (citing, *inter alia*, *Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 02-CV-2561, 2003 WL 22227956 (S.D.N.Y. 2003)).  Although the Court finds that Plaintiffs' RICO claims are time barred as currently pled, the claims are not frivolous.  Accordingly, there is no basis to impose sanctions.

## IV. Conclusion

For the reasons set forth above, Defendants' motions to dismiss for failure to state a claim are granted as to all causes of action in the Complaint, and Plaintiffs' claims are dismissed without prejudice.

SO ORDERED.

_/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge

Dated:     November 30, 2020
           Brooklyn, New York